THE FIRST NATIONAL BANK OF COLORADO v. N. B. BROWN.

No. 7203.

1. **Possession as Evidence of Ownership.**— Where plaintiff was in actual possession of a stock of cattle, and a part of them were seized and converted without any right, it was proper to charge the jury, "that the defendant not having shown any right to or interest in the cattle in controversy, can not question the plaintiff's right of possession of said cattle, if they found plaintiff had such possession."

2. **Actual Possession of Cattle.**—See facts held sufficient to show lawful possession of a stock of cattle on the range by a purchaser, but whose evidence of purchase was not recorded.

3. **Practice — Proof by Plaintiff.**—Plaintiff having alleged ownership and possession as against defendant, who exhibited no claim, was entitled to recover upon proving such possession; that on his purchase of the cattle he took a bill of sale, would not require the production of such bill of sale in order to recover.

4. **Immaterial Allegation.**—In personal action for taking and conversion of personal property, the allegation of the county where the trespass was made is immaterial; e. g., allegation that cattle were taken in Yoakum County, held immaterial that the taking was shown to have been in Gaines County.

5. **Verdict Excessive.**—See facts not supporting a verdict for taking 350 head of cattle, for which reason case is reversed.

APPEAL from Martin. Tried below before Hon. WM. KENNEDY.

This was an action by appellee in the District Court of Martin County, against Karr, the sheriff of said county, the First National Bank of Colorado, its president Scott, and its agent Smoot, for damages for the unlawful seizure and conversion of 350 head of cattle in Yoakum County, of which cattle plaintiff alleged "he was the legal and equitable owner," and of which he was in the actual and exclusive possession. In another count·plaintiff alleges that the cattle had been seized under an attachment directed to the sheriff of Martin County in an action by the said First National Bank against W. L. Purcell et al.; that the cattle were seized by said sheriff under direction of Scott and Smoot, and in Yoakum County, outside the jurisdiction of said sheriff, etc.

The defendant pleaded a general denial.

The testimony was as follows:

N. B. Brown, the plaintiff, testified: "I am the plaintiff; * * * live in Jones County, Texas. Know the cattle described in petition. I owned them and had them in my possession in Yoakum County from April 23, 1888, until they were taken by the defendants, which was done without my consent. I owned 450 head of cattle in the brands described in the petition. I was not in person present at the ranch, but had said cattle in Yoakum County through employes, whose business it was to attend to the pumps and keep the cattle rounded in at the well, where they were watered by wind mill. I had old man Perry Chapman and

Warren Harrington employed for this purpose. I now (September 21, 1889) have only 100 head of said cattle left.''

On cross-examination: '' I bought the cattle in controversy in April, 1888, through E. D. Harrington, my agent. A bill of sale in writing was taken, and I paid for the cattle. The cattle were to be delivered to me at the H Ranch, in Yoakum County. E. D. Harrington was to receive the cattle for me, and he went up to the well in Yoakum County, where the cattle were delivered to him for me. Marks and brands were not recorded until to-day; were never recorded in Howard County.''

S. M. Karr testified: '' That he is one of the defendants, and knew the cattle in controversy. That he had, at the instance of his codefendant Scott, employed Robert Lynch and Robert Wiley to go and gather and bring said cattle to Marienfield. That in June, 1888, said Lynch and Wiley went after the cattle described in plaintiffs' petition, and in the latter part of said month returned with ninety-seven or ninety-nine head of said cattle, which they delivered to defendant Scott at Marienfield. In July, 1888, Lynch and Wiley delivered to said Scott 144 head more of said cattle. All of the cattle so delivered were placed in the cars by Scott and shipped out of the county. The First National Bank of Colorado paid Lynch and Wiley for their services. The defendants Scott and Smoot were and are president and cashier of said bank respectively. The defendants, the First National Bank of Colorado, W. Scott, and H. B. Smoot, agreed in writing to indemnify and save witness from all costs and damages that he might be liable for because of his acts in regard to said cattle. That everything he (witness) did was done by him relying on said writing for his protection, and that he had no interest in said matter personally, and acted only for his codefendants at the special instance of the defendant Scott, and relying on said writing for his protection. That Scott directed him to get the cattle; * * * but did not tell him to get any special number. Did not tell him to gather them in Yoakum County. The H Ranch has always been considered to be in Gaines County. Smoot never directed me to gather any cattle.''

E. D. Harrington testified: '' In April, 1888, witness, as agent for plaintiff, bought the cattle from W. L. Purcell, on condition that they were as represented; the cattle to be delivered to him for plaintiff at the H well in Yoakum County. That plaintiff sent witness west from Jones County, where plaintiff and witness lived, to look at said cattle, and if satisfactory and as represented, receive and take charge of them for him. Witness and Purcell reached the well April 28. * * * They rode through the cattle that were at or near the well, and witness being satisfied that the cattle were as represented, received them for the plaintiff, and put old man Chapman in charge of them for the plaintiff. The cattle were not counted, but there were about 400 at and near the well, and the few

that were out were represented to be at the INK well, about twelve or fourteen miles off. All the brands as set out in the petition were sold to plaintiff. A bill of sale was taken from Purcell to Brown for the cattle. It was not recorded.''

Warren Harrington testified: '' Witness was employed by plaintiff in April, 1888, to come to Yoakum County and take charge of the cattle in controversy. From April to June, 1888, had charge of said cattle for plaintiff, and held them at the H well in Yoakum County. The cattle were loose on the range; were not in any enclosure, but were held at the well by being turned back and by having to come to the well to get water. There was no surface water, and the only supply was from the well. The cattle remained on the prairie in vicinity of the well, and witness kept the wind mill in repair that pumped the water for them in order to hold the cattle. Witness and old man Chapman, who was also employed by plaintiff, looked after the cattle. They all the time rode around the cattle on the range, and turned those back to the well that were disposed to stray too far off. There were no stated round-ups, as in other parts of the State, where cattle are rounded up twice or three times a year, the calves branded, and then turned loose again, to go at will until the next round-up; but those in charge looked after them all the time, and kept them at the wells as near as possible. At the time the cattle were taken Bud Purcell had a well eighteen or twenty miles on the south, and Hargroves a well twelve or fourteen miles north, and there were no other wells nearer than thirty or forty miles. On the 19th of June, 1888, witness had gone down to get some cattle belonging to plaintiff that were at Bud Purcell's well. While there Lynch and Wiley came to the wind mill, where the cattle were rounded up, and told witness that they had orders for the cattle described in plaintiff's petition. All the cattle that were in the brands belonging to plaintiff were cut out of the round-up at Purcell's well and driven off by Lynch and Wiley up to the well where they belonged—the H well in Yoakum County. There were eighteen or twenty head of the cattle brought up from Purcell's well at this time, and some were gathered at the V well in Yoakum County. The V well was owned by plaintiff, and was in Yoakum County, but was not then in use. When Lynch and Wiley reached the H well nearly all of plaintiff's cattle were at or near the well waiting for water, as they had been without water for two days. Lynch and Wiley rounded up all the cattle in the brand belonging to the plaintiff, and took charge of them. There were between 300 and 400 head so rounded up and taken possession of by them—nearer 400 than 300—and were all of plaintiff's cattle except what were at the INK well. When the cattle were rounded up by Lynch and Wiley, there was no pasture or pen to hold the cattle in, and they did not have force to hold them under herd at night, and turned them loose. Next day they went to the Hargrove well to get what cattle were there,

and came back by the H well next day and got such of the cattle as were convenient and took them off. Plaintiff owned 450 head of cattle in the brands as set out in the petition, and witness and old man Chapman had held them at the H well from April, 1888, to the time they were taken by Lynch and Wiley, except such as had gone to Purcell's and Hargrove's wells. We kept the cattle under charge all the time, and had continual round-ups at the well. When Lynch and Wiley took the cattle they took all that were in the brands belonging to the plaintiff, and claimed them for defendants."

C. C. Johnson testified: "Witness was in the cattle business in Gaines County, and knew the market value of cattle in that section of the State in spring and summer of 1888. They were worth $10 per head."

W. A. Quebendeaux testified: "I live in Gaines County, and know the value of said cattle as owned by plaintiff and in Yoakum County. They were worth in the spring and summer of 1888 $10 per head. I know of sales at that price."

The defendant introduced the following:

S. M. Carr: "Know the cattle in controversy, and know what they were worth on the market in 1888. They were worth $9 per head."

Robert Lynch testified: "The defendant Karr employed me to gather the cattle in controversy for the First National Bank of Colorado, Texas, and in June, 1888, Robert Wiley and I went up to get said cattle. When we got to Bud Purcell's well in Gaines County, the cattle that watered there were rounded up, and we cut out all the cattle that were in the brands set out in plaintiff's petition, and drove them north to the H well, picking up some cattle in said brands on the way. We estimated that we had about 35 head of the cattle in controversy when we reached the H well. The cattle were turned loose with others in the same brands at the H well, and when we got ready to come home we got such as were convenient. When we got to Marienfield we delivered 99 head to Scott, and 31 head got away from us and were not delivered, though they were brought down. I was instructed to gather the cattle in controversy wherever found, and I claimed all cattle in said brands wherever I found them. As we went north we took all the cattle we could find and drove them to the H well and turned them loose with those in the same brands there, after we had rounded them all up and took charge of them. We made a second trip in July, and on our return delivered to Scott at Marienfield 144 head more. On this trip we went up one draw to the east of the H well and came down another draw, the one the well is in, and found cattle at several wells, both going and coming."

Robert Wiley: "Witness was with Lynch. The number stated by Lynch as delivered here was correct. Nine head that were in the last bunch were among the number that got away the first trip. They left two cows and calves on the road on the second trip. We were instructed

to take the cattle in controversy wherever found, and we claimed and took all we found in the brand as we came to them. The cattle were gathered at different places, 100 miles apart at furthest points."

Verdict was rendered for plaintiff against all the defendants except Karr for 350 head at $10 each. Judgment for $3500. The defendants appealed. The charge and action of the trial court complained of are shown in the opinion.

*Chas. A. Jennings*, for appellants.—1. The asserted possession of cattle running loose on the range, the title to which is claimed to have been acquired by purchase of the marks and brands from another, is unlawful, unless supported by a bill of sale duly recorded as required by law; and such a possession can not be invoked to sustain a suit for trespass or tort in taking said cattle, brought by a party claiming to be such a purchaser, whose asserted possession is not supported by the evidences of his title as aforesaid. Black v. Vaughan, 70 Texas, 47; Rev. Stats., arts. 4562, 4564.

2. The plaintiff having alleged in his petition that the cattle were taken from his possession in Yoakum County, the probata should concur with the allegata, and the plaintiff could not recover for any cattle taken outside of Yoakum County. Mims v. Mitchell, 1 Texas, 443; Hall v. Jackson, 3 Texas, 305; Lemmon v. Hanley, 28 Texas, 227; Heilbroner v. Hancock, 33 Texas, 714.

3. The best evidence of plaintiff's right of possession and ownership of the cattle, for the taking and conversion of which he instituted this suit, was his bill of sale; and having purchased said cattle by their marks and brands, the production of the same in evidence, duly recorded, was absolutely essential to his right of possession of the same. Black v. Vaughan, 70 Texas, 47; Rev. Stats., art. 4564; 1 Greenl. Ev., secs. 82, 86, 87.

4. The plaintiff having failed to establish by his evidence that there was recorded anywhere in his name the same marks and brands that were on the cattle alleged to have been converted, and he having failed to produce in evidence a bill of sale of the cattle by said marks and brands, which had been recorded as required by law, and he having established by his evidence that the cattle alleged to have been taken and converted by defendants were at the time of said alleged taking and conversion running loose on the range, the plaintiff had by his said evidence failed to prove any lawful possession, actual or constructive, of said cattle, or any right of possession or ownership in the same, and the court should therefore have sustained defendants' motion to exclude plaintiff's testimony. Black v. Vaughan, 70 Texas, 47; Rev. Stats., arts. 4556, 4561, 4564.

*Cockrell & Cockrell*, for appellee. — 1. A mere trespasser can not require plaintiff who has shown a prima facie right of possession to prove up the title; and the cattle in controversy having been actually delivered to

plaintiff at the date of his purchase, whether such purchase was regular and in strict compliance with the statute or not, were prima facie, and as against an entire stranger, the property of plaintiff. Cool. on Torts, 444, 445.

2. Article 4564 of Revised Statutes should be strictly construed and applied to sales strictly of marks and brands as cattle run on the range, unaccompanied by an actual delivery or an attempt at actual delivery. Rev. Stats., arts. 4562, 4564; Black v. Vaughan, 70 Texas, 47.

3. Regardless of bill of sale, plaintiff showed prima facie right. Wells v. Littlefield, 59 Texas, 556.

FISHER, JUDGE, *Section. B.* — This is an action by appellee against the appellants, the First National Bank of Colorado, Winfield Scott, H. B. Smoot, and S. M. Karr, for $6000 as damages, the value of 350 head of cattle, alleged to be the property of appellee, and that were taken and converted by appellants and the defendant Karr.

The defendants answered by general demurrer and general denial.

Judgment was rendered in the court below in favor of appellee against all of the defendants except Karr for $3500, the value of 350 head of cattle at $10 per head.

The first assignment of error complains that the court erred in its charge to the jury wherein they were instructed, " That the defendants not having shown any right to or interest in the cattle in controversy, can not question the plaintiff's right of possession of said cattle, if they found plaintiff had such possession." It is urged that this charge is improper, because the evidence shows that the cattle were purchased by the appellee by the marks and brands when they were loose on the range, and that actual possession was not delivered at the time they were purchased, and that at the time they were taken by the appellants they were not in the actual possession of appellee, but running on the range; and that at the time of such purchase a bill of sale was executed and delivered to appellee, but it was never recorded.

It is not pretended that the appellants denied or justified the taking of the cattle, and for the purpose of considering this question they are regarded as naked trespassers. The appellants' contention would probably be correct, and it would fall within the rule announced in Black v. Vaughan, 70 Texas, 48, if the facts were as stated by them. Upon the contrary, we think the evidence shows that at the time the cattle were purchased by the appellee they were actually delivered to him and his agents by his vendor, and that at the time he paid for them. The bill of sale was executed at the time, describing cattle in certain marks and brands. The evidence shows that these cattle were in the marks and brands, and were by the agents of appellee examined and inspected before purchase, in order to ascertain if they were as represented by the vendor;

and they were found as represented and the sale concluded, and the cattle actually delivered to appellee's agent.

The facts further tend to show that the cattle were in actual possession when they were taken and converted by the appellants; but if there be any question as to the sufficiency of the evidence upon this point, we think the fact that they may have been loose upon the range when taken would not, as a matter of law, place them out of the possession of the true owner. Cattle running upon their accustomed range are held to be in the possession of the owner, and such possession is regarded as sufficient to hold a wrongdoer or trespasser liable who invades it. The fact that the purchase of the cattle was accompanied with an actual delivery, takes the sale without the provisions of article 5464, Sayles' Civil Statutes, as construed in Black v. Vaughan.

In this connection, it is further insisted that the possession of the cattle by the appellee was illegal, because there was no evidence of execution of the bill of sale; that the bill of sale was not offered in evidence, or its absence accounted for, but that the plaintiff relied upon parol evidence of his purchase as justifying and showing a legal possession of the cattle.

It seems from the evidence that the plaintiff, in making his case, only proved his purchase of the cattle by parol evidence, and that he had paid the consideration therefor, and relied upon his prior possession of the cattle as the evidence of his right against the trespassers, such purchase being proven in order to show that his possession was legal.

Articles 4562 and 4563, Sayles' Civil Statutes, were construed by this court in the case of Wells v. Littlefield, 59 Texas, 561. There it is said: "The penalty for not taking such written instruments [bills of sale] upon receiving possession of cattle is, that the possession shall be deemed prima facie illegal. It is not made conclusively unlawful, but is open to explanation; and nothing prevents a title to such property from passing without a bill of sale if it can be proved that it was bona fide, made upon sufficient consideration, and that no evasion of the law was intended." We think the evidence shows a bona fide purchase of the cattle by appellee upon a sufficient consideration.

It is next contended, that the existence of the bill of sale being shown, parol evidence of title was not admissible. The plaintiff, in making his case, was not relying upon his bill of sale as the evidence of his right to recover against appellants, but relied solely upon his possession of the cattle as evidence of title sufficient to authorize a recovery against a wrongdoer or naked trespasser. The evidence with regard to the purchase was simply to show that he had legal possession of the cattle. It was not necessary to prove the facts establishing a title in order for the plaintiff to recover against a trespasser without the semblance of right. This is not a contest concerning the title to the property, or the rights of different claimants. But it is a proceeding solely against those who have un-

lawfully invaded the possession of another. In such a case the plaintiff can rely solely upon his possession as evidence of right sufficient to permit a recovery. Cool. on Torts, 2 ed., 511, 512, 516–521; Linard v. Crossland, 10 Texas, 462.

It is insisted that the court erred in instructing the jury, " that the place or county where the conversion took place, if they found there was a conversion, was immaterial,'' for the reason that the plaintiff in his petition alleged the ownership and possession of the cattle in Yoakum County, and the evidence shows they were in Gaines County. It is insisted that in this respect the evidence does not correspond with the allegations. This may be true, but we do not regard the allegation of the place material. Evidence of an immaterial allegation is not required. But if an effort is made to prove it, and the place shown by the evidence does not correspond with that alleged, such failure does not give importance to an allegation that the law regards as immaterial. This question might only become important when the tort was committed within a different jurisdiction. But this question is not before us, and we express no opinion concerning it. Cool. on Torts, 2 ed., 551.

It is insisted that the verdict is excessive, and that the evidence does not connect the appellants the First National Bank and H. B. Smoot with the trespass, and therefore in that respect the judgment is erroneous. We have examined the evidence in the particulars complained of, and find the evidence as to the value and number of cattle taken sufficient to support the verdict, and that the bank and Smoot were parties to the trespass.

We deem it unnecessary to notice other assignments.

We conclude the case should be affirmed, and so report it.

Adopted May 3, 1892.

*C. A. Jennings* and *E. H. Graham* argued motion for rehearing.

### ON MOTION FOR REHEARING.

STAYTON, CHIEF JUSTICE. — We have re-examined the record in this case on motion for rehearing, and feel constrained to hold that all the rulings in the former opinion except one are correct.

In the former disposition of the case it was held that the evidence was sufficient to show the conversion of 350 head of appellee's cattle; but an examination of the evidence now satisfies us that this holding was erroneous, and on this ground alone the former judgment of this court will be set aside and the judgment of the District Court reversed and the cause remanded.

It is so ordered.

*Reversed and remanded.*

Delivered May 31, 1892.