**RATTAN CHEVROLET, INC., Appellant,**

v.

**ASSOCIATES DISCOUNT CORPORATION, Appellee.**

**No. 17310.**

Court of Civil Appeals of Texas.

Dallas.

June 20, 1969.

Rehearing Denied July 18, 1969.

Ralph Elliott, of Elliott & Nall, Sherman, for appellant.

Robert W. Minshew and Jack Kennedy, of Brown, Kennedy & Hill, Sherman, for appellee.

CLAUDE WILLIAMS, Justice.

This is a case of first impression in Texas involving the construction of certain portions of Acts 1967, 60th Texas Legislature, Chapter 785, referred to as "Business and Commerce Code", and especially Title 1 thereof, commonly referred to as "Uniform Commercial Code". Inasmuch as the case involves the custom and practice between finance companies and deal-

ers in new automobiles, known as "floor planning", the proper resolution of the questions presented calls for a determination of the relationship between the Uniform Commercial Code and portions of the Texas Certificate of Title Act, Art. 1436-1, Vernon's Annotated Penal Code of Texas.

This action was instituted by Associates Discount Corporation (hereinafter referred to as Associates), against R. A. Parker d/b/a R. A. Parker Chevrolet (hereinafter referred to as Parker), and Rattan Chevrolet, Inc. (hereinafter called Rattan), in which Associates sought judgment on three promissory notes executed by Parker and for foreclosure upon certain "security agreements" which allegedly created a security interest in three new Chevrolet vehicles which were alleged to have been sold by Parker to Rattan. It was charged that Rattan was in possession of the vehicles and claimed ownership therein. Associates caused the vehicles to be seized from Rattan and sold under writ of sequestration. Rattan answered by asserting that it had acquired the three vehicles, for a valuable consideration, from Parker in the ordinary course of business and from constituted inventory, within the meaning of the Uniform Commercial Code. It claimed that at the time the automobiles were seized by writ of sequestration it was the true owner of said automobiles and that Associates had no right to seize same. By cross-action Rattan charged that Associates was guilty of conversion of the automobiles; that such conversion was done with malice; and that it was entitled to both actual and exemplary damages against both Associates and its surety on the sequestration bond. Rattan also sought judgment against Parker for the value of the automobiles. Parker filed no answer to either of these pleadings.

Thereafter, Associates filed its motion for summary judgment, supported by the affidavit and deposition of Dan Malear, its manager, in which he stated under oath that on July 26, 1966 Associates filed with the Secretary of State a financing statement which secured Associates as required by law. He also stated that on January 12, 1968, January 31, 1968 and February 2, 1968 Parker executed three promissory notes and also three security agreements to secure the payment of the notes representing monies advanced by Associates to Parker for the purpose of financing new automobiles. Malear related that the notes had not been paid and that the security agreements had not been cancelled but were still effective.

Rattan also filed its motion for summary judgment, supported by affidavit of its general manager, in which he related facts concerning the purchase by Rattan from Parker of the three vehicles in question, said purchases being made from inventory stock of Parker in the ordinary course of business and expressly denying any lien by any security agreement which was effective as against Rattan. He said that neither he nor anyone connected with Rattan had any actual knowledge of any financing statement nor had any actual knowledge of any security agreement allegedly securing the promissory notes in question.

The trial court sustained the motion for summary judgment of Associates, rendering judgment in favor of Associates against Parker and also decreeing a foreclosure of lien provided by the security agreements upon the three vehicles in question. The court denied the motion for summary judgment of Rattan. Parker does not appeal from the judgment against him.

Rattan perfects this appeal asserting four points of error in which he contends (1) that since the undisputed evidence established that Rattan purchased the new automobiles for value out of Parker's inventory and in the ordinary course of business the court erred in granting summary judgment to Associates; (2) that since the undisputed evidence established that Rattan acquired title to the new auto-

mobiles by paying value therefor at a purchase out of inventory in the ordinary course of business the court erred in not granting the summary judgment sought by Rattan (except as to damages); and (3) and (4) that since the undisputed proof established that Rattan acquired title to the new automobiles the court erred in not holding that Associates was guilty of conversion and in failing to require Associates to deliver the manufacturer's statement of origin of the automobiles to Rattan.

The material antecedent facts reflected by the record may be briefly summarized: On July 26, 1966 Associates, a company engaged in the business of financing the purchase of automobiles, filed with the Secretary of State a "financing statement" pursuant to the Uniform Commercial Code against Parker, as debtor, on

"A.  New and Used Motor Vehicles. Chattel Paper.

B.  All proceeds of the property are also covered: Including but not limited to proceeds of sale of all motor vehicles covered by this statement, including money, accounts receivable, chattel paper and motor vehicles received in trade."

On January 10, 1968 Parker acquired a new 1968 Chevrolet four-door Impala sedan. The manufacturer's statement of origin covering this vehicle revealed no liens. On January 12, 1968 Parker executed a "security agreement" to Associates which specifically described the Impala automobile and which was given to secure a promissory note of even date and representing the amount advanced by Associates to Parker to purchase the vehicle. Associates retained possession of the manufacturer's certificate of origin.

While the Impala was a part of the inventory of Parker it was, on February 8, 1968, sold by Parker to Rattan. Parker did not deliver nor cause to be delivered the manufacturer's statement of origin to Rattan.

On January 31, 1968 Parker acquired a new 1968 Chevrolet Caprice sedan. The manufacturer's statement of origin covering this vehicle did not have noted thereon any liens. On the same day, January 31, 1968, Parker executed a "security agreement" in favor of Associates covering the Caprice automobile to secure a note bearing even date therewith. Subsequently, on February 8, 1968, while the Caprice was a part of the inventory stock of Parker, he sold it, for value, to Rattan, who acquired the automobile but apparently the manufacturer's statement of origin was retained by Associates.

On January 29, 1968 Parker acquired a new 1968 Chevrolet Fleetside pickup vehicle. The manufacturer's statement of origin covering this vehicle recites no liens. On February 2, 1968 Parker executed a "security agreement" to Associates covering the pickup vehicle to secure a note of even date. Subsequently, on February 8, 1968, while the vehicle was a part of the inventory stock of Parker, he sold the same, for value, to Rattan. The manufacturer's statement of origin was not delivered to Rattan but apparently retained by Associates.

Each of the above described "security agreements" executed by Parker in favor of Associates contained the provision that:

"This transfer and sale is made for the purpose of creating a security interest in Associates in all of the above described chattels and any proceeds thereof to secure to Associates the prompt repayment by the Dealer of the new value this day advanced by Associates to the Dealer as evidenced by said promissory note and to secure any other indebtedness which now exists or may hereafter occur from the Dealer to Associates."

Each agreement also contained the provision that:

"That the possession by the Dealer of the above described chattels is solely for the purpose of selling or exchanging said chattels or of procuring their sale or exchange to a Buyer in the ordinary course of Dealer's trade."

The agreements also provided:

"Upon disposition of any part or all of said chattels or proceeds, Associates and the Dealer shall have the respective rights and duties with respect to said chattels and proceeds that are provided for in the Uniform Commercial Code of the State of Texas.

The terms used in this instrument shall have the same interpretation and construction as they are given in the Uniform Commercial Code of the State of Texas."

Following all of the above described sales Associates filed in the office of the County Clerk of Grayson County, Texas, on February 16, 1968 and in the Office of the Secretary of State on March 12, 1968 a "financing statement" filed pursuant to the Uniform Commercial Code, such statements naming Parker, as debtor, and covering: "Office furniture, fixtures, parts, shop equipment, accounts and notes receivable, new and used cars and trucks."

.It is the principal contention of appellant Rattan that its purchase of the three new automobiles out of inventory from Parker in the ordinary course of business was governed by the terms and provisions of the Texas Uniform Commercial Code and especially Section 9.307 of that law which provides that a buyer in ordinary course of business takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence. Appellant therefore contends that it purchased the three new automobiles free and clear of any security interest claimed by

Associates by virtue of its agreement with Parker.

Appellee Associates argues that the terms and provisions of the Texas Uniform Commercial Code have no application to the transactions in question but that the case is governed by the Texas Certificate of Title Act. It contends that since it retained in its possession the manufacturer's certificate of origin on each of the new automobiles such fact effectively prevented Rattan from acquiring the automobiles free and clear of liens and encumbrances.

Several important legal questions are thus clearly presented. First, does the Texas Uniform Commercial Code control the sales demonstrated in this record? Secondly, did the Legislature of Texas by its enactment of the Texas Uniform Commercial Code either expressly or impliedly repeal the provisions of the Texas Certificate of Title law relating to liens on new automobiles subject to first sale?

Since we are not aided with Texas authorities to guide us to a proper resolution of these questions we must carefully review and analyze the statutory enactments in an attempt to determine the legislative intent evidenced thereby.

Admittedly for the purposes of simplifying, clarifying and modernizing the law governing commercial transactions; to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and to make uniform the law among the various jurisdictions, the Legislature of the State of Texas, 59th Regular Session, 1965, enacted Chapter 721 known as the Uniform Commercial Code, same becoming effective at midnight June 30, 1966. Pursuant to Section 10–102 a large number of pre-existing laws related to business and business transactions were expressly repealed and pursuant to Section 10–104 certain laws were expressly not repealed. The Texas Certificate of Title Law (Art. 1436–1, Penal Code) is not specifically referred to in either of these sections. In Section 9–402 of the Com-

mercial Code of 1965 are set forth the formal requisites of financing statements it being therein provided that a financing statement may be filed before a security agreement is made or a security interest otherwise attaches. Section 9–401 provided that the proper place to file in order to perfect a security interest was the county clerk and the Office of the Secretary of State. Section 9–303 provides that a security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken. If such steps are taken before the security interest attaches, it is perfected at the time when it attaches. By the provisions of Section 9–302 of the Act it was expressly provided that (3) the filing provisions of the Act do not apply to a security interest in property subject to a statute "(b) of this state which provides for central filing of, or which requires indication on a certificate of title of, such security interest in such property."

The 60th regular session of the Texas Legislature in 1967, Chapter 785, formally adopted the Business and Commerce Code and, as a part thereof, re-enacted the Uniform Commercial Code, originally enacted in 1965, including same in the Business and Commerce Code as Title 1. The Texas Uniform Commercial Code conforms substantially to the official text of the code promulgated by the American Law Institute and the National Conference of Commissioners on Uniform State Laws. The official text as well as the 1965 Act employs a system of section numbers with a dash, as in Section 1–101. The 1967 code uses a point in lieu of the dash, so that Section 1–101 becomes Section 1.101, etc.

The Uniform Commercial Code, as a part of the Business and Commerce Code, became effective September 1, 1967. The appendix found at the conclusion of Volume 3 of Vernon's Texas Business and Commerce Code Annotated, lists the various laws repealed by the Uniform Commercial Code. The Texas Certificate of Title Act is not specifically referred to in this appendix.

By the express provisions of Section 5 of Chapter 785, Acts 1967, 60th Legislature, it is provided that: "The repeal of a statute by this Act does not affect (1) the prior operation of the statute or any prior action taken under it; * * *."

The present Uniform Commercial Code re-enacted the former code of 1965, with certain amendments and modifications. The 1967 code re-enacts the provisions relating to perfection of financing and security agreements and their filing with the Secretary of State and the county clerk.

Section 9.302 of the code is explicit in dealing with security interests in motor vehicles required to be registered. It provides:

"(a) A financing statement must be filed to perfect all security interests except the following: * * * (c) The filing provisions of this Chapter do not apply to a security interest in property subject to a statute; * * * (2) of this state which provides for central filing of, or which requires indication on a certificate of title of, such security interests in such property, *unless such property is inventory*.[1] (d) A security interest in property covered by a statute described in Subsection (c) can be perfected *only* by registration or filing under that statute or by indication of the security interest on the receipt for a duly filed application for Certificate of Title or for Corrected Certificate of Title or on a Certificate of Title or a duplicate thereof by a public official. *Where the collateral is a motor vehicle or other property of the kind subject to a statute which provides for perfection by central filing or by indication of*

---

1. The words "unless such property is inventory" have been added by amendment to the 1965 Act, quoted above.

*security interest on a certificate of title and the collateral is inventory, a security interest in such collateral may be perfected only by complying with the filing provisions of this Chapter."* [2] (Emphasis supplied.)

Section 9.306 of the code expressly extends a security interest to the identifiable proceeds of the sale of such property. Thus, in (b) of this section it is provided:

"Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor *unless his action was authorized by the secured party in the security agreement or otherwise,* and also continues in any identifiable proceeds including collections received by the debtor." (Emphasis supplied.)

Section 2.403 of the code provides:

"(b) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer *all rights of the entruster* to a buyer in ordinary course of business." (Emphasis supplied.)

The comment, 1 U.C.C., page 299, under this section, says:

"The many particular situations in which a buyer in ordinary course of business from a dealer has been protected against reservation of property or other hidden interest are gathered by subsections (2)–(4) into a single principle protecting persons who buy in ordinary course out of inventory. Consignors have no reason to complain, nor have

lenders who hold a security interest in the inventory, since the very purpose of goods in inventory is to be turned into cash by sale."

The key provision of the new code, relied upon by appellant, being Section 9.-307, is:

"(a) A buyer in ordinary course of business (Subdivision (9) of Section 1.201) * * * takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." [3]

"[A] [b]uyer in ordinary course of business," as defined in Section 1.201 of the code, "means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind * * *."

Subdivision (25) of Section 1.201 of the code provides that: "A person has 'notice' " or has "knowledge" of a fact when he has actual knowledge of it.

Section 9.109 of the code defines "inventory" as property "held by a person who holds them for sale or lease or to be furnished under contracts of service * * *."

Art. 1436–1 of the Texas Penal Code was in force and effect at all times material to this litigation. Section 41 of that Act provides that:

"No lien shall be valid on any motor vehicle which is hereafter the subject of a first sale, or be enforceable against

---

2. The latter sentence of (d), quoted above, has been added by amendment to the 1967 Act and does not appear in the 1965 code.

3. The comment under this section obviously deals with the 1965 code since the section is referred to as "Section 9–302". The commentator states that after a financing statement has been filed or after compliance with the certificate of title law

all subsequent buyers, under the rule of subsection (2), are subject to the security interest. Subsection (2) referred to by the commentator is obviously the subsection (2) of old Section 9–302, of the 1965 Act, quoted above. This subsection has been changed and modified by the 1967 Commercial Code with the addition of the words "unless such property is inventory."

any such motor vehicle unless there is noted on the importer's or manufacturer's certificate the date, name, and address of the mortgagees whose rights arise out of or are incident to such first sale by reason of the execution of any written instrument by the transferee."

■ A careful analysis of both the Uniform Commercial Code and the Certificate of Title Act leads us to the conclusion that, in some particulars, both statutes deal with the same general subject and have the same general purpose. We are of the opinion and so hold that the two statutes should be considered as being in pari materia. The rule of statutory interpretation and construction of statutes in pari materia is stated in 53 Tex.Jur.2d, § 186, pp. 280–283, as follows:

"It is a settled rule of statutory interpretation that statutes that deal with the same general subject, have the same general purpose, or relate to the same person or thing or class of persons or things, are considered as being in pari materia though they contain no reference to one another, and though they were passed at different times or at different sessions of the legislature.

In order to arrive at a proper construction of a statute, and determine the exact legislative intent, all acts and parts of acts in pari materia will, therefore, be taken, read, and construed together, each enactment in reference to the other, as though they were parts of one and the same law. Any conflict between their provisions will be harmonized, if possible, and effect will be given to all the provisions of each act if they can be made to stand together and have concurrent efficacy.

The purpose of the in pari materia rule of construction is to carry out the full legislative intent, by giving effect to all laws and provisions bearing on the same subject. The rule proceeds on the supposition that several statutes relating to one subject are governed by one spirit and policy, and are intended to be consistent and harmonious in their several parts and provisions."

When we consider these statutes together, we are of the opinion and so hold that the sale of the three new automobiles by Parker to Rattan out of his inventory in the ordinary course of business was such as to implement the terms and provisions of Section 9.307 of the Uniform Commercial Code so that Rattan took the automobiles free of a security interest attempted to be created by Associates.

■ Obviously, it was the specific intent of the Legislature by re-enacting the Uniform Commercial Code in 1967 to provide that the same applied where the collateral is a motor vehicle, in inventory, and sold pursuant to the terms of Section 9.307 of the code. Being specific in reference to the Certificate of Title law as well as pointing specifically to automobiles as securty, it cannot be said that the Legislature ignored the provisions of the Texas Certificate of Title law by enacting the Uniform Commercial Code nor did it attempt to repeal same. What the Legislature intended to do was to clarify security interest provisions as they related to specific sales and under specific circumstances as enumerated by the code.

■ Facts and circumstances evident in this record bring the transactions in question clearly within the terms of the Uniform Commercial Code. Although Associates in its brief and oral argument before this court attempts to deny the effect of the Uniform Commercial Code and clings to the Texas Certificate of Title Act as being the only law applicable, its actions in attempting, since 1966, to comply with the Uniform Commercial Code as well as attempting to perfect security interests in compliance with the code, goes counter to its contention now advanced. The filing of the financing agreement in 1966, under the 1965 code, complied with that Act, and pursuant to a savings clause in the 1967 Act, such filing apparently continued in ef-

fect under the new code. By the very terms and provisions of the three security agreements taken by Associates from Parker it was expressly agreed that possession of the automobiles was delivered to Parker for the express purpose of selling or exchanging same and procuring a buyer in ordinary course of Parker's trade. Certainly it was the intent of Associates by permitting Parker to place the automobiles in his inventory and display the same for sale in the ordinary course of business to convert said automobiles into cash. The code, Section 9.306, expressly gave Associates a security interest in the proceeds of the sale of the automobiles. However, the code also expressly provides in Section 9.307 that the purchaser of the automobiles, in ordinary course of business, takes the same free of the security interest even though the buyer knows of the existence of such interest.

Under these conditions and pursuant to the express terms of the Uniform Commercial Code we hold:

(1) That the terms and provisions of the Uniform Commercial Code control the sale of the new automobiles in question;

(2) that Rattan purchased the automobiles free of the security interests created by Associates; and

(3) that Associates did not have the legal right to seize the automobiles in question.

Our opinion is supported by authorities from other jurisdictions, especially the State of Pennsylvania, which has adopted the Uniform Commercial Code and which also has a similar certificate of title law. Sterling Acceptance v. Grimes, 194 Pa. Super. 503, 168 A.2d 600 (1961); Weisel v. McBride, 191 Pa.Super. 411, 156 A.2d 613 (1959); Associates Discount Corp. v. Old Freeport Bank, 421 Pa. 609, 220 A.2d 621 (1966); Girard Trust Corn Exchange Bank v. Warren Lepley Ford, Inc. (Penn. Ct.Com.Pleas 1957), 12 Pa.Dist. & Co.2d 351; Select Motors v. Kemp (Penn.Ct.Com. Pleas 1967), 42 Pa.Dist. & Co.2d 603;

Taylor Motor Rental, Inc. v. Associates Discount Corp., 196 Pa.Super. 182, 173 A.2d 688 (1961); Howarth v. Universal C. I. T. Credit Corp., 203 F.Supp. 279 (U.S.Dist.Ct. Pa.1962); and Oscoda State Savings Bank v. McAllister, 6 Mich.App. 82, 148 N.W.2d 257 (1967).

Accordingly, we hold that the trial court was in error in granting the motion for summary judgment in favor of Associates and sustain appellant's point of error No. 1.

We turn now to a consideration of appellant's points 2, 3 and 4 in which it contends that the trial court should have sustained its motion for summary judgment except as to the rendition of damages for conversion. The facts are undisputed that the three automobiles were seized or caused to be seized by Associates under its claim of title and security interest in said automobiles. As we have previously held in connection with appellant's point of error No. 1 Rattan, as purchaser of the automobiles from the inventory of Parker in the ordinary course of business, acquired said automobiles free and clear of any security interest asserted by Associates. It then became the duty and obligation of Associates to deliver to Rattan the manufacturer's certificate of origin covering the three new automobiles. By the very terms of the security agreement executed by Associates and Parker covering each of the automobiles in question, Associates expressly gave Parker the right to sell the vehicles and convert same into cash. Section 2.403 of the Uniform Commercial Code, subdivision (b) expressly states that any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer *all rights of the entruster* to a buyer in the ordinary course of business. The identical situation was discussed by the court in Weisel v. McBride, 191 Pa.Super. 411, 156 A.2d 613 (1959), and there the court concluded that under the same circumstances and pursuant to the identical provision of the Uniform Commercial Code in Pennsylvania that equity should decree directing the entruster

to deliver to the purchaser the title to the automobile in question.

■ As to Rattan's motion for summary judgment based on conversion, other than the amount of damages, we find the record to be clear to the effect that the elements of conversion are established beyond question. To constitute a conversion of property in the sense in which that word is used in law, there must be some repudiation of the owner's right or an exercise of dominion over the property, wrongfully and in denial of or inconsistent with the right of the owner. 14 Tex.Jur.2d, § 3, pp. 9–10. A wrongful taking of personal property from the possession of the owner is a conversion. This is true even though the taking be under a void writ of sequestration. Crawford v. Thomason, 53 Tex.Civ. App. 561, 117 S.W. 181 (1909, writ ref'd). In the latter case the court said:

" 'Any distinct act or dominion wrongfully exerted over one's property in denial of his right, or inconsistent with it, is a conversion.' This definition seems to be in accord with the weight of authorities on the subject of conversion, which further hold that the wrongdoer cannot question plaintiff's title or right of possession, nor defeat recovery by showing that the taking was in good faith and under a mistake. Amer. & Eng.Enc.Law (2d Ed.) 679, 681, 691, 693, 694; First Nat. Bank v. Brown, 85 Tex. 80, 23 S.W. 862; Vickery v. Crawford, 93 Tex. 373, 55 S.W. 560, 49 L.R.A. 773, 77 Am.St.Rep. 891; * * *. The writ of sequestration under which the sheriff acted in moving appellees' storehouse conferring no lawful authority for such act, the situation of all parties acting with him is the same as if no writ of sequestration had ever issued, so far as affects appellees' claim for actual damages."

The elements of actual conversion being demonstrated by appellant Rattan, other than the amount of damages, the trial court should have rendered the summary judgment in part, leaving only the consideration by the trial court of the question of damages.

■ Since both parties (Associates and Rattan) filed motions for summary judgment, and the trial court having granted Associates' motion and overruled Rattan's motion, and since Rattan has perfected its appeal to this court, it is our duty to determine all questions presented in the trial court. Tobin v. Garcia, 159 Tex. 58, 316 S.W.2d 396 (1958). Accordingly, we sustain appellant's points 2, 3 and 4, holding that the trial court was in error in refusing to sustain Rattan's motion for summary judgment on the question of conversion (without deciding the question of the matter of damages) and in refusing to order Associates to deliver to Rattan the manufacturer's certificate of origin on the automobiles wrongfully seized by Associates.

The judgment of the trial court insofar as it affects Associates' recovery against Parker is affirmed. The judgment of the trial court granting Associates' motion for summary judgment and decreeing foreclosure of security interests in the three automobiles in question is reversed and here rendered denying Associates right of security interest in the three automobiles in question. That part of the trial court's judgment denying Rattan's motion for summary judgment is here reversed and judgment rendered for Rattan against Associates and Parker for conversion of the three automobiles in question. The case is reversed and remanded to the trial court only for the purpose of arriving at the amount of damages, if any, of Rattan against Associates and Parker.

Affirmed in part, reversed and rendered in part, and reversed and remanded for the limited purpose of ascertaining damages, if any.