Robert SHERROCK and Edward Sherrock,
Co-partners trading as Sherrock
Brothers, Plaintiffs,

v.

COMMERCIAL CREDIT CORPORATION, a
Maryland corporation, Defendant.

Superior Court of Delaware,
New Castle.

April 23, 1971.

John M. Bader, Wilmington, for plaintiffs.

Arthur J. Sullivan and Daniel L. Twer, of Morris, James, Hitchens & Williams, Wilmington, for defendant.

STIFTEL, President Judge.

In the pretrial stage of the present litigation the question was raised whether plaintiffs could be considered a "buyer in ordinary course of business" so as to be brought within the protection of 5A Del.C. § 9–307(1), which reads, in pertinent part, as follows:

> "A buyer in ordinary course of business (subsection (9) of Section 1–201) * * * takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

A "merchant buyer" would be considered a "buyer in ordinary course of business", 5A Del.C. § 1–201(9), if he meets all the following conditions: (1) Be honest in fact; (2) be without actual knowledge of any defects of title in the goods; (3) pay value; and (4) observe reasonable commercial standards. 5A Del.C. § 2–103(1) (b). See Sherrock Bros. v. Commercial Credit Corporation, 269 A.2d 407 (Del.Super.); but cf. Rattan Chevrolet, Inc. v. Associates Discount Corp., 443 S.W.2d 360 (Tex.Civ.App.) (not holding merchant buyer to higher standard of care). In observance of the commercial standards, the merchant is further charged with the knowledge or skill of merchants in that trade. 5A Del.C. § 2–104 (3). The first three conditions above have

been met by plaintiffs. The remaining question is whether plaintiffs acted in a "commercially reasonable manner".

On September 27, 1968, Bernard Mc-Sweeney of Dover Motors, an American Motors dealership, telephoned Robert Sherrock, a partner with his brother Edward in an American Motors dealership, at their offices in Hazelton, Pennsylvania. Mr. McSweeney, being informed that Robert was at the Zone Office of American Motors in Philadelphia, called him at that location. McSweeney asked Robert if Sherrock Brothers was interested in purchasing two new automobiles, since Dover Motors was overloaded with new cars. Robert said he would take the cars. Sherrock, assenting to the terms suggested by McSweeney, was to make transfer of funds on the same day, September 27, 1968, in the amount of $6,701.15, to the Bank of Delaware, Dover branch. Mr. Sherrock, without inquiry, assumed that the transmittal of funds to the bank related to clearing any financing arrangements relating to the automobiles involved. McSweeney said that Dover Motors would deliver the vehicles to Hazelton, but asked if Sherrock Brothers would wait a couple of days after October 1. This was the announcement day for the new models and McSweeny wanted the vehicles for display purposes since they were already on the showroom floor. Mr. Sherrock assented, never demanding a firm delivery date.

Sherrock Brothers never had business dealings with Dover Motors in the past. Robert Sherrock did, however, meet McSweeney on several occasions at various American Motors business functions. On one particular trip, during the summer before the instant transaction, which McSweeney and Sherrock attended in the same group, they had occasion to casually discuss the possibility of a buy-sell transaction. Sherrock referred to himself as a small dealer selling approximately 140 cars per year and indicated that because of his small size, he was supplied with only 4 or 5 new cars in the early weeks after the announce-ment date. This was true even though he was able to sell more at the opening of the new season. McSweeney, on the other hand, selling between 300 and 400 new automobiles each year, was considered a big dealer and received more cars than Sherrock at announcement time. The fact that the big dealers got all the new cars was apparently the subject of kidding conversation. At the time of the aforementioned trip, McSweeney told Sherrock that if he was oversupplied at the time of announcement, he would give him a call.

On September 27, 1968, Peoples First National Bank and Trust Co., Hazelton, Pennsylvania, financed the transaction for Sherrock and sent to the Bank of Delaware, Dover branch, a check for $6,701.15, to be deposited in the account of Dover Motors. While McSweeney said that this account was used solely for paying the floor planners after a sale had been made, no evidence shows that Commercial Credit received funds representing this transaction.

On October 2, 1968, while making a check of Dover Motors floor, Commercial Credit learned that Dover Motors was selling cars for which no payment was being made to Commercial Credit; therefore, selling "out of trust". On October 4, 1968, the aforesaid vehicles, along with all the new automobile inventory, were repossessed by defendant. All other automobiles were repossessed by defendant the following day, October 5, 1968. Commercial Credit states that at no time was it told that any of the vehicles that were taken were the property of retail purchasers at the time of repossession on October 4, 1968.

Testimony is, therefore, undisputed that Robert Sherrock relied on McSweeney to deliver the vehicles rather than to "pick them up" himself. He also made no inquiry as to McSweeney's desire to retain possession of vehicles that McSweeney could not sell, despite the fact that his own dealership could have used the extra vehicles, and would have been in an excellent position to sell them at announcement time.

It is admitted that Sherrock paid for the vehicles at least four days before Robert Sherrock could expect delivery. Finally, payment was made at McSweeney's request on September 27, 1968, without inquiry as to the financial stability of a firm with which Sherrock Brothers had no prior dealings.[1]

The sale transaction affected not only a buyer and a seller, but also a secured creditor, who had an interest in the automobiles as collateral. As is true in the case of a "buyer in ordinary course of business" who purchases in an entrusting situation,[2] so also in the case of a secured creditor attempting to assert his priority under 5A Del.C. § 9–307(1), the Code's policy should protect the party who does not, in fact, expect, or should not be expected, to foresee and guard against the particular risk involved. Compare Universal C. I. T. Credit Corp. v. Middlesboro Motor Sales, Inc., Ky., 424 S.W.2d 409.

In the situation falling under 5A Del. C. § 2–403(3), namely, the entrusting situation, it has been noted in Speidel, et al., Commercial Transactions Teaching Materials, 758 (1st ed. 1969) that:

"The relevant policy questions involve · the problem of achieving a fair risk allocation between 'true' owner and 'BFP' and facilitating commercial transactions. According to Professor Warren (see Warren, 'Cutting Off Claims of Ownership Under the Uniform Commercial Code', 30 U.Chi.L.Rev. 469 (1963), these questions are resolved by increased protection for the purchaser. To him, the Code 'represents substantial progress in the long journey toward the attainment of a mercantile or commercial theory regarding goods, documents and instruments * * *' and the inclusion of UCC 2–403 'granting a measure of negotiability to goods in a commercial setting, has been the most dramatic step forward.' 30 U.Chi.L.Rev. at 492."

Even in the context of an Article 2 transaction where an entrustment is involved, the Code under certain circumstances does not protect the buyer of the goods, even if he can be called a buyer in the ordinary course of business under the Code definition. Note especially 5A Del.C. § 2–402(2), which states:

"A creditor of the seller may treat a sale or an identification of goods to a contract for sale as void if as against him a retention of possession by the seller is fraudulent under any rule of law of the state where the goods are situated, except that retention of possession in good faith and current course of trade by a merchant-seller for a commercially reasonable time after a sale or identification is not fraudulent."[3]

---

1. Sherrock did testify that while at Philadelphia on September 27, the Zone Manager, as a matter of informal conversation, stated that Dover dealers had done well in the past, indicating how many cars are usually sold. Robert stated, however, that he asked no particular questions of the manager, and did not reveal to him the circumstances of this particular sale. Whether or not Sherrock should have made proper inquiry with regard to Dover Motors' financial ability will be discussed later.

2. Entrusting is defined at 5A Del.C. § 2–403(3) as including:
   " * * * any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law."
   Note No. 3 to 5A Del.C. § 2–403 (3) states that entrusting is defined as:
   " * * * including any delivery or acquiescence in retention of possession regardless of whether the procurement of the goods constituted larceny at common law."

3. I do not decide here whether 5A Del.C. § 2–402(2) applies in this case, since the point was not raised by the parties. It is important, however, to consider the policy of this section as having a bearing on whether or not the merchant-buyer

In the Article 9 situation under 5A Del.C. § 9–307(1), the policy should be substantially the same within the ambit of the statutory guidelines of the Code itself. That is, there should be a rational and equitable risk allocation in the context of the existing commercial setting. Under Article 9, the Code, therefore, should seek to protect the "buyer in ordinary course of business" when the seller sells out of trust in violation of his contractual duty to the secured party. The Code in this circumstance expects the secured party to look to the seller for his remedy. The buyer, on the other hand, is protected since he is permitted to assume that the seller did as he was supposed to do, that is, pay the floor planner when the car is sold. The "buyer in ordinary course of business" is not expected to foresee and guard against the risk of his seller selling out of trust. If, however, the buyer cannot qualify as a "buyer in ordinary course of business", the Code dictates that as between the buyer and the secured creditor, the secured creditor shall prevail.

While there is no precise definition of the phrase, "the observance of reasonable commercial standards of fair dealing in the trade", nevertheless, departures from customary usages and commercial practice should be viewed as strong indicia that the practice is not reasonable. At the same time, I must be cautious enough to realize that a solution which equates custom and trade usage with only one reasonable commercial standard could be unfortunate for an ever-changing commercial setting. As noted in Malcom, The Proposed Commercial Code, 6 Bus.Law 113, 128 (1951), citing the 1950 Committee, comments:

"* * * there immediately arises the very difficult problem of what usages, customs and practices are those intended to be included in the standard. Any lawyer who has ever attempted to prove what usage or custom is will immediately recognize how litigious such a standard could grow to be * * * More serious still is the possibility that 'reasonable commercial standards' could mean usage, customs or practices existing at any particular time. This could have the very bad effect of freezing customs and practices into particular molds and thereby destroy the flexibility absolutely essential to the grand evolution of commercial practices—a result which the Code draftsmen certainly would never desire."

In the absence of any evidence that the deviation is at least accepted in the trade, though not customary, the different practice used will be viewed with some suspicion. 1 Anderson, Uniform Commercial Code, 214, § 2–103:7 (2d ed. 1970). See for example, Mattek v. Malofsky, 42 Wis.2d 16, 165 N.W.2d 406; Atlas Auto Rental Corp. v. Weisberg, 54 Misc.2d 168, 281 N.Y.S.2d 400.

Mr. Willard O. Campbell, past President of Future Ford, Inc., and now President of Future Ford Sales, Inc., an individual personally involved with the sale and purchase of new cars to and from other deal-

---

acted in a reasonably commercial manner when he permitted the seller to retain possession while specifying no fixed delivery date.

Here, the judgment is similar to that in the entrusting circumstance, namely, while ordinarily, as between the parties, a delivery is not essential to complete a sale of personal property, the seller's retention of possession of the personal property, after an absolute sale, is a recognized indicia of fraud. Generally, therefore, in the absence of any valid reason, the sale is considered void as to creditors of the seller. See generally, 37 Am.Jur.2d, "Fraudulent Convey-ances", §§ 38–41. The judgment of where the risk should fall is against the buyer, despite the fact that he can seemingly fit clearly in the definition of the buyer in the ordinary course. 5A Del.C. § 1–201 (9). The rationale is that,

"* * * even though the price is paid * * * the law regards the buyer as in fault and as acting unfairfairly and fraudulently in allowing the seller, by retaining the possession, to hold out the apparent evidence of ownership, thereby inducing others to purchase or to credit him to their injury * * * *". 37 Am.Jur.2d, "Fraudulent Conveyances", § 42.

ers, testified that during the past 15 year period he had been involved in similar purchases or sales involving approximately 1000 automobiles. The gist of his testimony could be summarized as follows:

1.  Dealers who purchase new cars from other dealers customarily pick up the cars themselves rather than rely upon the selling dealer to deliver them.

2.  Regardless of whether the cars are picked up or delivered, the purchasing dealer makes payment to the selling dealer only upon actual receipt of the cars purchased.

3.  Payment for a new car from one dealer to another before actual receipt of the car is both an unusual and unreasonable procedure in the automobile industry. This is true even where the dealers involved have dealt with one another in the past.

4.  This practice is even more unusual and unreasonable where the dealers involved have not dealt with one another in the past.

5.  It was unreasonable for Sherrock to pay for an automobile for which he had no firm delivery date; and as to which he would not be in an immediate posture to display and sell.

6.  Mr. McSweeney's request to delay delivery so that he could display vehicles he should not sell was highly unusual.

Sherrock himself forthrightly stated, in substance, that while he had conducted numerous transactions of this kind before, he had never before proceeded in this manner. He further stated that he was not aware of any other dealership having conducted transactions of this type in this manner.

While it is customarily true, and statutorily recognized in 5A Del.C. § 9–307(1),

that the merchant buyer does not have to question the existence or operation of his seller's floor planning arrangement, it is also true the standard of conduct for the merchant buyer is higher than that of a normal retail buyer. Further, while it is true that the Code in 5A Del.C. § 9–307(1) seeks to protect the merchant buyer in a situation where his seller sold out of trust, it is also true that the merchant buyer cannot be protected where the spirit of § 9–307(1) is violated; that is, where the buyer's actions would not permit him to be classified as a "buyer in the ordinary course". The merchant buyer, therefore, is assumed to know the customs of the trade and should know that others connected with trade transactions, such as floor plan financial institutions, follow and rely on the procedures established by these customs. The merchant is assumed to know that the floor planner makes periodic checks of the dealer's stock, at which time the dealer has to account for each car on the floor planner's list.

The merchant buyer is assumed to know that normally when the floor planner secured party makes a check of the floor and discovers that cars have been sold out of trust, he has only one way in which he can protect his interest. He can proceed against any "proceeds" pursuant to a valid and perfected security interest in the same as per 5A Del.C. § 9–306(2), which states:

> "Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

If, therefore, a vehicle has been sold out of trust, the floor planner must expect to look only to the proceeds.[4]

---

4.  According to the Official Code Comment 9–306, not adopted by Delaware, Comment 2:

> "Whatever the formulation of the rule, the secured party, if he could trace the proceeds, could reclaim them or

In the instant situation, Commercial Credit did not know that these cars were sold out of trust, and therefore, made no efforts to seek out the proceeds for their sale. Sherrock is assumed to know that if no provision is made to indicate that title to the vehicle no longer rests with the selling dealer, the floor planner will continue to act in its capacity with respect to the cars as if they have never been sold. Here Sherrock permitted Dover Motors to display cars on its sale show room floor that were, in fact, not for sale. Further, Sherrock neither made arrangements nor inquiry as to how or whether the cars would be designated as belonging to someone other than Dover Motors. If Commercial Credit had checked the floor of Dover Motors any time before the sale transaction of the 27th of September, the status of the two cars in question would appear to be no different than after that date; that is, as part of Dover Motors' unsold inventory.

While I do not intend to announce a fixed custom for this trade, realizing that it is the Code's policy to permit deviation from customs and usage by agreement, I do intend to point out that in this instance, where no deviation has been noted before by either the expert witness or the plaintiff himself, and where the secured party relied on the trade custom, the risk of loss should be borne by Sherrock, the buying merchant. I find that the reasons mentioned by Sherrock and McSweeney for the manner in which this transaction was conducted, amounted to nothing more than conveniences for McSweeney, and are not reasonable to justify deviation from the established reasonable commercial practice. Robert Sherrock as a bargaining party to

the transaction, presumed to have the skills of a merchant in his trade, should have taken steps to protect his interests in what Mr. Campbell, the expert witness, referred to as a "highly unusual transaction". Whether or not the facts warranted an inquiry into the financial status of the selling dealer, this Court does not have to say. What actions should have been taken either beyond or short of that type of inquiry is also a question that does not necessitate an answer.

The facts as found establish that Sherrock in conducting this transaction in the way described caused defendant to rely on a reasonable custom of the trade. Defendant in so relying acted in relation to the displayed vehicles that were not designated or described in any way as having been sold at any time up to the date of repossession, as if they had not been sold. Commercial Credit could not have been expected to proceed against proceeds in a situation where it did not know that its collateral had been sold. As in the case of 5A Del.C. § 2–402(2), where possession causes reliance by a creditor, so, too, in this situation, the policy should be the same.

A buyer, *a fortiori* a merchant buyer, should not be protected when he is considered at fault, as where in the present situation the buyer effectively permits the seller to mislead the secured party, *supra*, at 8 and 9.

Since plaintiffs cannot be said to have acted in a commercially reasonable manner, they cannot qualify as buyers in the ordinary course and cannot, therefore, be protected under 5A Del.C. § 9–307(1).

their equivalent from the debtor or his trustee in bankruptcy. The change in existing law made by this Section relates to non-identifiable cash proceeds; the secured party has, under conditions stated in subsection (4) (d), a security interest in the debtor's cash and bank accounts equal to the amount of cash proceeds received and commingled or

deposited within the 10 days before insolvency proceedings were instituted less the amount of cash proceeds received by the debtor and paid over to the secured party during that period, without regard to whether or not the funds are identifiable as cash proceeds of the collateral."