# McFADDEN *v.* MERCANTILE-SAFE DEPOSIT & TRUST COMPANY

[No. 240, September Term, 1970.]

*Decided February 3, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, SINGLEY, SMITH and DIGGES, JJ.

*Gary Goldstein* and *Charles M. Tatelbaum,* with whom were *Schimmel & Tatelbaum* on the brief, for appellant.

*George T. Tyler* for appellee.

BARNES, J., delivered the opinion of the Court.

The principal questions in this appeal from the judg-

ment of the Superior Court of Baltimore City (Sodaro, J.) of May 25, 1970, in favor of the appellee, Mercantile-Safe Deposit and Trust Company (Mercantile), defendant below, for costs in an action at law to recover damages, filed by the appellant and plaintiff below, Charles D. McFadden, for the alleged conversion by Mercantile of two ice cream trucks purchased by McFadden from Mister Softee of Maryland, Inc. (Softee), are whether the lower court, sitting without a jury, clearly erred (i) in failing to find from the evidence in the case that Mercantile authorized the sale of the trucks so that McFadden purchased them free and clear of Mercantile's security interest pursuant to the Uniform Commercial Code (UCC)—Code (1964, Repl. Vol.), Art. 95B, § 9-306 (2) and (ii) in finding that McFadden did not purchase the two trucks "in the ordinary course of business" pursuant to the UCC, Art. 95B, § 9-307 (1), and for this reason was subject to Mercantile's security interest.

On October 20, 1967, Mercantile loaned $200,000.00 to Softee. Softee gave Mercantile two chattel mortgages covering 30 of its ice cream trucks including the two ice cream trucks involved in the present case. Softee and Mercantile executed a financing statement, dated October 20, 1967, pursuant to the Uniform Commercial Code. After describing the debtor (Softee), the secured party (Mercantile) and reciting that the obligation had no maturity date, the financing statement stated:

"4. This financing statement covers the following types (or items) of property: (List)

"All present and future *inventory* which includes new and used motor vehicles held *for sale* or lease including ice cream manufacturing equipment thereon, such as ice cream compressors, generators, and freezers."
(Emphasis supplied.)

The indented language was inserted in the printed form by typewriting.

The form then continues with the following printed material:

"Check ☒ the lines which apply".

The third box is:

"☐ (Proceeds of collateral are also covered)".

This box was marked with an "X" in typewriting.

The financing statement was executed by both parties, Softee and Mercantile, and at the bottom of the form appear notations indicating proper recordation on October 24, 1967, and the words "Mailed to Secured Party" were placed on the form by means of a rubber stamp.

On March 21, 1968, McFadden purchased two used Ford ice cream trucks from Softee and on that day executed (with his wife Sarah Lorraine McFadden — since deceased) a Conditional Sale Contract on a printed form, apparently used generally by Mercantile inasmuch as its name "Mercantile-Safe Deposit and Trust Company" appears at the top left-hand side of the form. After the printed word "Buyer" appears the name and address of McFadden written in by typewriting; and after the printed word "Seller," there is typewritten the name and address of Softee. The printed conditional sale contract then provides:

> "The undersigned seller hereby sells, and the undersigned buyer (jointly and severally if more than one), having been quoted both a time and a cash price hereby purchases on a time price basis, in its present condition and subject to the terms and conditions herein set forth, the following motor vehicle, including parts, tires, equipment and accessories thereon, (herein sometimes called Car) delivery and acceptance of which in good order are hereby acknowledged by buyer, viz:
>
> Two used Ford model No. P.350, Van, Serial Number
>
> JE 153983
> JE 124272"

Under the heading "Record of Transaction," the following appeared: (1) The cash price of car, including extra equipment was $27,000.00; (2) there were no charges for delivery, installation, repairs, or other services not included in Item (1); (3) the cash delivered price (the sum of Items 1 and 2) was $27,000.00 and (4) the down payment was $10,000.00, leaving (5) a total unpaid balance of $17,000.00. Various provisions in regard to vehicle insurance were then inserted and then certain charges as follows:

| | |
|---|---|
| Cost to Buyer of Group Creditor Life Insurance | $   340.00 |
| Recording and filing charge | 3.50 |
| Principal Balance (sum of Items 5, 6, 7 & 8) | 17,343.50 |
| Finance Charge | 4,420.00 |
| Time Balance | 21,763.50 |

The buyer agreed to pay the Time Balance at Mercantile in accordance with an attached schedule. This schedule shows the future payment of various monthly amounts on a seasonal basis beginning in May 1968 for $300.00, with $700.00 in June, $1,000.00 in July, August and September of that year and dropping to $500.00 in October and to $50.00 in November and December of that year. In 1969 the payments varied from $100 to a high of $1,050.-00; in 1970 from a low of $100.00 to a high of $1,041.00; in 1971 from a low of $100.00 to a high of $1,281.50 and in 1972 there were to be four payments of $100.00 each in the first four months of that year.

Other provisions of the Conditional Sale Contract will be considered later in this opinion.

Also on March 21, 1968, McFadden as Dealer (and his wife, subsequently deceased) executed a "Dealer Franchise Agreement" with Softee as sales franchise Representative for Mister Softee, Inc., a corporation having its principal place of business at Runnemede, New Jersey (Representative). In this Dealer Franchise Agreement, the first whereas clause recites:

"THAT WHEREAS, Representative has the franchise from Mister Softee, Inc. to *sell* 'Mister Softee' mobile trucks, equipment, supplies, parts and merchandise, to appoint Dealers and to license use of the trademarked and copyrighted name 'Mister Softee' in the territory hereinafter described,".

The second whereas clause recites:

"AND WHEREAS, Dealer desires to *buy* one or more 'Mister Softee' mobile ice cream trucks for the sale of soft-serve ice cream, hard ice cream, frozen desserts, novelties, stick items and other products specifically approved and authorized by Mister Softee, Inc. in accordance with the policies and procedures as prescribed from time to time by Mister Softee, Inc."
(Emphasis supplied.)

The agreement in Paragraph 1 (a) then grants the Dealer (McFadden) a franchise to conduct a "Mister Softee" mobile truck business for the sale of soft-serve ice cream (and the other products referred to above) in a designated territory in Prince George's County.

Subparagraph (b) provides:

"(b) If the Dealer is *purchasing* more than one 'Mister Softee' truck for operation in the above described territory it is agreed there will be a specific franchise agreement for each truck and Dealer agrees to purchase the additional truck(s) in accordance with the following schedule."
(Emphasis supplied.)

The term of the agreement is for 20 years from its date and the Dealer may extend it for "any number of additional periods of ten years upon ninety days written notice to Representative prior to the end of said term."

There are provisions in the agreement for bodily lia-

bility insurance, property damage and products liability insurance, issued in the names of the Dealer, the Representative and Mister Softee, Inc. Insolvency of the Dealer automatically terminates the agreement. Paragraph 7 of the agreement provides:

"7. ASSIGNMENT.

"The franchise granted by this agreement is not assignable by Dealer except upon the following terms:

"(a) Dealer shall first obtain the written consent of Representative and Mister Softee, Inc.

"(b) The purchaser shall be a financially responsible person acceptable to Representative and Mister Softee, Inc.

"(c) The purchaser shall enter into a new Dealer Franchise Agreement with Representative in the form then current, before financing papers and sale contract have been completed and executed and title has been transferred.

"(d) Dealer shall concurrently with the assignment make payment in full of all outstanding obligations to Representative and Mister Softee, Inc.

"(e) Dealer shall pay to Mister Softee, Inc. a transfer fee in the sum of Two Hundred and Fifty Dollars ($250.00) for the preparation of a new Dealer Franchise Agreement in the assignee's name, and for any and all such expenses incurred by Representative and Mister Softee, Inc. in effecting said transfer.

"(f) Upon the completion of the sale, with the approval of Mister Softee, Inc., this Dealer Franchise Agreement is hereby terminated and cancelled and Dealer hereby releases Mister Softee, Inc. and Representative from any and all claims of any manner, kind or thing of any description whatsoever and Mister Softee, Inc. and Representative agree to release the Dealer

from any and all claims of any manner, kind or thing of any description whatsoever when Dealer has fully complied with all provisions of this paragraph 7 and its subsections."

Paragraph 8 gives the Representative or Mister Softee, Inc. the right to terminate the agreement upon an unremedied default in performance of any of the obligations by the Dealer upon 10 days notice.

Paragraph 9 provides:

"9. EFFECT OF TERMINATION.

"(a) Upon the termination of this agreement, or any extension, for any reason, Representative or Mister Softee, Inc. or the assigns of either of them, may, at their option, purchase from Dealer one or more of the 'Mister Softee' mobile ice cream trucks which Dealer owns at that time for an amount or amounts equal to the following listed percentages of the purchase price paid for each such truck by Dealer.

| "Length of Time Dealer Owned Truck | "Percentage of Dealer's Purchase Price to be Paid to Dealer |
|---|---|
| 1 year or any fraction thereof | 65% |
| 1 year but less than 2 years | 45% |
| 2 years but less than 3 years | 30% |
| 3 years but less than 4 years | 15% |
| More than 4 years | 5% |

"Such option(s) to purchase must be exercised by Representative or Mister Softee, Inc. within sixty days after the termination of this agreement.

"(b) Upon the termination of this agreement, or any extension, for any reason, Dealer covenants that he will not, for a period of two years after such termination, directly or indirectly engage or participate in any business which is the same or similar to that conducted by him under

> this agreement in the territory covered by this
> agreement or in any county or city whose border
> is within ten miles of such territory."

The record indicates that McFadden had no knowledge of the existence of any security interest existing in favor of Mercantile on the two trucks. Mercantile does not claim that McFadden had such knowledge.

Softee defaulted on its obligations to Mercantile and foreclosure proceedings were instituted by Mercantile on July 9, 1968. The trustee appointed by the court to sell, sold all of the trucks (including the two trucks involved in the present case) at public auction on July 29, 1968, for $49,000.00. Mercantile received $43,006.34 net as a result of the sale.

Thereafter McFadden filed an action at law against Mercantile, claiming in the Fourth Amended Declaration that McFadden had no knowledge of the security interest of Mercantile and as a purchaser of the two trucks in the ordinary course of business took them free and clear of the security interest. The foreclosure sale of the trucks was alleged to be a conversion for which $27,000.00 damages with interest from the date of conversion and costs were recoverable. Mercantile filed two pleas, i.e., that (1) it did not commit the wrongs alleged and (2) was not indebted as alleged.

At the hearing before the lower court, sitting without a jury, the first witness for McFadden was Daniel Fitzpatrick, Vice President of the Loan Department of Commercial Savings and Bank of Bel Air. He identified 13 conditional contracts of sale between Softee and various purchasers for nine Softee ice cream trucks described in the contracts of sale, and, by analysis of the prices in the contracts, possibly 11 additional trucks. A number of the buyers in these Conditional Sale Contracts are from Baltimore City, some are from Glen Burnie and one is from McKeesport, Pa. The contracts were "Reproduced from records kept by the bank in the ordinary course of business." The contracts were purchased by the bank "as

third party paper." An examination of the 13 contracts indicates that the seller in each case was Softee.

McFadden, himself, testified that he purchased the two vehicles in question from Softee. He gave Softee two checks for a total of $6,000.00 and a promissory note for $4,000.00 to make up the down payment of $10,000.00 mentioned in the Conditional Sale Agreement. He did not operate the trucks himself, and it was his understanding that Softee would handle the purchase of supplies, employ the drivers and "take care of all the business end of it," Softee to account to him for the profits. He did not make any of the payments called for in the schedule attached to the Conditional Sale Contract. He waited several months "possibly" when he heard nothing from Softee. Softee had his down payment and his note and he "assumed it to be all right." McFadden drove down to Softee's plant at Glen Burnie after a telephone conversation with a Mr. Seifert, a representative of Softee, from which he had given McFadden the "impression" that financing could not be obtained for McFadden. McFadden wished to speak to a Mr. Marshall but was unable to see him. Later Marshall called him, indicated that he had heard that McFadden was "a little unhappy" about the situation and stated that if McFadden was unhappy about it, "he would try to rectify it for me." McFadden said "that if he would give me my money back he could sell my trucks and naturally I would want my note and debt cleared." Marshall stated "Well, I will sell your trucks."

McFadden also testified that he became involved in the transaction by having heard of it from a friend and it "sounded like a rather nice investment" and "seemed a rather lucrative opportunity to make a little money." In his federal income tax return for 1968 he had entered on Line 5 of Schedule D: "Investment, Mr. Softee of Maryland, worthless."

Robert E. Ledsome testified that McFadden had come to him with a mutual friend and told him that he was interested in purchasing one Softee truck but ultimately purchased two trucks. Ledsome had sold some trucks for

Softee before, received a commission, and was operating one truck "on my own at the time." He explained to McFadden that the Efficient Service Corporation, a subsidiary of Softee, would operate the trucks for him. Softee owned the two trucks sold to McFadden. He had seen them—Nos. 72 and 73—on the Softee lot. Their condition was "[f]abulous; the best I had ever seen a Softee truck." Ledsome had sold some five Softee trucks, had, himself, purchased three trucks and had in addition, operated 10 trucks for Softee. In regard to how the two trucks sold to McFadden were to be operated, Ledsome testified:

> "Mr. Softee of Maryland, Webster H. Marshall in particular, the President of the company, informed me that when I sold the trucks to Mr. McFadden to advise him that his trucks will be operated by Initial Service, Incorporated; that he would handle his insurance; make the payments at the bank; they would handle all Workmen's Compensation; and they would handle the complete bookkeeping system for ten percent of what that truck would create, and the rest of the money would then go to Mr. McFadden."

In regard to the $4,000.00 note, Ledsome stated:

> "This note was part of the down payment. He paid $6,000.00 in cash and he signed a note for $4,000.00, of which Softee was going to hold it. But they were also going to retire this note, I think at six cents a gallan on every gallon of mix that he bought. That is the way the note was to be retired."

This arrangement was acceptable to Softee. It was "their own plan."

The trucks were white and blue and had a distinctive name "Mr. Softee" which is copyrighted. The window area of the truck is illuminated by a fluorescent light on

the outside of the truck and there is a sound device on the truck which plays a song copyrighted by Softee.

James H. Everly, a former mechanic for Softee in charge of maintenance of the Softee ice cream trucks, testified that the Boyertown body on the trucks was made exclusively for Softee, and that the ice cream freezer and other additions were installed by Mr. Softee, Inc. at its New Jersey headquarters.

After a motion for judgment in favor of Mercantile at the end of McFadden's case was denied, Mercantile offered the testimony of three witnesses.

Herbert B. Williams, Senior Vice President of Mercantile, testified in regard to the $200,000.00 loan to Softee. He stated that in addition to the 30 trucks, the proceeds of the collateral "was constituted as additional collateral other than the trucks"; and this was marked on the financing statement. When asked why the Mercantile made the loan, Mr. Williams testified:

> "Well, it was, at the time, it was a way to expand our installment type lending, and also if the trucks were operated that they would be able to pay the loan back."

He also stated that at the time of the execution of the chattel mortgages on October 20, 1967, Mr. Marshall had told him that Softee owned the trucks.

On cross-examination, Mr. Williams testified that he knew the trucks were sold as an integral part of the franchise and that he knew that the people who purchased the trucks "would become the owner of the truck that he had." He knew Softee was going to operate the trucks and was going to try to sell them, "if possible."

When asked whether Mercantile was going to finance the truck or the franchise, Mr. Williams stated:

> "Well, we were financing an amount of money and the truck was the vehicle used to generate it in connection to pay back the loan. However,

the person who was borrowing the money would obviously have to have just more than the truck.

"Q. The truck would be used by you as collateral, is that correct? A. We call that additional collateral, not primary.

"Q. What would the primary collateral have been? A. The man's personal statement."

Milton D. Warren, the truck sales manager and equipment specialist for Towson Ford, testified:

"I recognize, being a specialized piece of equipment, even at this point before the soft equipment was installed, the body had been altered to a point where it became a specialized body. With the addition of the equipment it was specialized to a point where it was not salable to the general buying public."

Counsel for McFadden moved to strike out this testimony because Mr. Warren was not qualified to testify so far as ice cream equipment was concerned, his expertise being only as to Ford chassis and Ford engines. This motion was overruled by the lower court.

The final witness for Mercantile was Edward C. Mullendore, its Vice President, who testified that he had a telephone conversation with McFadden, discovered he did not have the cash down payment at the time called for in the contract, but signed a note and gave checks. He told McFadden that Mercantile "would not finance the unit for him." McFadden told him if Mercantile was not going to finance it, he was going to ask for his money back. He would have to go to Softee. On cross-examination, Mr. Mullendore stated that he did not know when he made his first appraisal, that additional trucks were always coming from New Jersey. He stated: "There were additional trucks there but they belonged to private operators, . . . ."

The lower court filed a written opinion on May 20, 1970, indicating that McFadden was not a purchaser in

the ordinary course of business within the meaning of the Uniform Commercial Code, and that the trucks were equipment and not inventory so that the trucks were subject to Mercantile's security interest and hence were not converted by it when the trucks were sold at the foreclosure sale. As we have indicated, a judgment for the defendant, Mercantile, for costs was entered on May 25, 1970, and a timely appeal taken from that judgment by McFadden.

We have concluded that the lower court was clearly in error in its findings and conclusions and we shall reverse the judgment of May 25, 1970.

Initially it might be well to consider whether the transaction constituted an actual sale of the trucks to McFadden. The Conditional Sale Contract used by Softee in the sale to McFadden of the two trucks recites that Softee, the "undersigned seller" by the Conditional Sale Contract *"hereby sells,* and the undersigned buyer" (McFadden) "hereby *purchases* on a time basis. . .the following motor vehicle," etc. This language is only consistent with a sale of the trucks to McFadden. Nor, in our opinion, is the language of the Dealer Franchise Agreement inconsistent with the sale of the trucks. We have summarized and, in part, quoted this language above and need not repeat it here. It should be again emphasized, however, that paragraph 1 (b) refers to the *purchase* of "Mister Softee" trucks. The franchise gives the right to conduct the "Mister Softee" mobile truck business for the sale of soft-service ice cream, etc. and the dealer agrees *to purchase* a "Mister Softee" mobile ice cream truck. The franchise agreement, however, is obviously not limited to any specific truck inasmuch as its term runs for 20 years, with a right in the Dealer to extend the 20 year term for "any number" of additional 10 year periods upon 90 days written notice. It is apparent that no truck purchased by a Dealer will be useful indefinitely or even for the 20 year term. The provision for assignment, already quoted, is directed at the assignment of *the franchise* and does not purport to forbid *the sale* of the trucks owned by the

Dealer. Even upon termination, the Representative or Mister Softee, Inc. has the *option to purchase* from the Dealer the trucks "which Dealer owns at that time" in accordance with the prescribed schedule. This language is consistent with a sale of the trucks to McFadden.

## (1)

It is clear from Art. 95B, § 9-306 (2), that if Mercantile authorized its debtor, Softee, to dispose of the collateral, then McFadden purchased the two trucks free and clear of Mercantile's security interest in those trucks.

Art. 95B, § 9-306 (2) having the heading: " *'Proceeds'; secured party's rights on disposition of collateral,"* provides:

> " (2) Except where this subtitle otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

The Official Comment on § 9-306, which appears in Code, Vol. 95B, pages 396-98, immediately following the text of § 9-306, states, in relevant part:

> "In many cases a purchaser or other transferee of collateral will take free of a security interest: in such cases the secured party's only right will be to proceeds. The transferee will take free whenever the disposition was authorized; the authorization may be contained in the security agreement or otherwise given. A claim to proceeds in a filed financing statement might be considered as impliedly authorizing sale or other disposition of the collateral, depending upon the circumstances of the parties, the nature of the collateral, the course of dealing of the

parties and the usage of trade (see Section 1—205)."

In commenting upon this provision of the UCC, Spivack in his *Secured Transactions,* (3rd Ed. 1963) at page 53, states:

". . .[A] buyer of inventory in the ordinary course of business acquires rights in the goods free and clear of the interest of the secured party. This is as it should be as the financing of inventory contemplates resale of the collateral by the debtor."

Later, it is stated:

"It is in dealing with the category of inventory that we find the most important changes in the law of secured transactions. The floating lien and other major innovations of Article 9 deal primarily with the category of inventory. We have seen that the general rule with respect to inventory is that a security interest cannot protect the secured party from a sale of inventory to a buyer in the ordinary course of business. This rule is the natural consequence of the intent of both the secured party and debtor in a transaction involving this type of collateral. Certainly, the secured seller of inventory or the lender with that type of security for collateral desires the collateral to be disposed of by the debtor in the normal course of business, as the proceeds of the disposition will furnish the debtor with the wherewithal to liquidate the secured obligation."
*Id.* at 54, 55.

See also 2 Hawkland, *A Transactional Guide to the Uniform Commercial Code,* 709-11 (1964) where it is stated:

"When credit is extended against the security of inventory, the lender knows or should know

that the borrower usually contemplates selling the encumbered goods in order to raise money to repay the loan."

\* \* \*

". . .[T]he party taking security in inventory can protect himself against a buyer in the ordinary course only by perfecting his security by taking possession of the collateral, or by causing buyer to know of the restrictions that have been placed on the dealer, . . .

"Inventory financing usually must be done on a nonpossessory security basis, but if the dealer shows signs of weakness or dishonesty, the secured party might assume possession of the collateral and thus protect himself against all claimants, including the buyer in the ordinary course of business."

The basic question on this aspect of the case is whether or not the trucks were "inventory" or merely "equipment." If the trucks were "inventory" then a resale of the trucks by the debtor is indicated and the purchaser or other transferee of that type of collateral takes free of the security interest and the secured party's only right will be to the proceeds of such a sale, as the Official Comment indicates.

Art 95B, § 9-109 (2) and (4) contain the definitions of "Equipment" and "Inventory" respectively. It may be observed that the trucks are neither "Consumer goods" nor "Farm products" defined in subsections (1) and (3) respectively of § 9-109.

Goods are:

"(2) 'Equipment' if they are used or bought for use primarily in business (including farming or a profession) or by a debtor who is a nonprofit organization or a governmental subdivision or agency or if the goods are not included in the definitions of inventory, farm products or consumer goods;".

Section 9-109 (4) provides:

"(4) 'Inventory' if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment."

It will be noted that by the terms of the statutory material the classifications of goods are mutually exclusive. See to this effect, *Franklin Investment Co. v. Homburg*, 252 A. 2d 95, 97 (1969, Ct. of Ap. D.C.).

In the Official Comment to § 9-109 in paragraphs 2 and 3 (Code, Vol. 8B, p. 375), it is stated:

"2. The classes of goods are mutually exclusive; the same property cannot at the same time and as to the same person be both equipment and inventory, for example. * * *"

"3. The principal test to determine whether goods are inventory is that they are held for immediate or ultimate sale. Implicit in the definition is the criterion that the prospective sale is in the ordinary course of business. Machinery used in manufacturing, for example, is equipment and not inventory even though it is the continuing policy of the enterprise to sell machinery when it becomes obsolete. Goods to be furnished under a contract of service are inventory even though the arrangement under which they are furnished is not technically a sale. When an enterprise is engaged in the business of leasing a stock of products to users (for example, the fleet of cars owned by a car rental agency), that stock is also included within the definition of 'inventory' * * *."

The facts in the present case indicate to us that the

trucks subject to the security interest were indeed "inventory."

In the first place, the financing statement, itself, specifically states that it covers "All present and future *inventory*, which includes new and *used motor vehicles held for sale or lease. . . .*" This language could hardly be clearer that the trucks are "inventory" and such inventory includes "used motor vehicles held for sale" by Softee. There is no ambiguity here and nothing in the language is presented to us for construction.

Secondly, the financing statement has a check mark in the box "Proceeds of collateral are also covered." This further emphasizes that the motor vehicles described as *"present and future inventory"* are to be sold and that the secured creditor is to look to the proceeds of such sales for its security. Again this is what the financing statement states.

Thirdly, the testimony of the officers of the creditor, Mercantile, as well as that offered on behalf of McFadden, indicates that the creditor understood that the trucks were to be sold by Softee, the debtor, even if the sale was made in conjunction with franchises issued by Softee. As we have indicated above, Mr. Williams testified that Mercantile knew that the trucks would be sold by Softee, that the purchasers would become owners of them and that Softee was going to sell them, "if possible." Mr. Mullendore stated that he "expected the man that was *going to buy* to know that [they would be in operating condition]." (Emphasis supplied.) Then, too, Mercantile apparently supplied Softee with its forms for a Conditional *Sale* Contract for use in connection with Softee's sale of the trucks.

We find that the sale of the trucks was implicitly authorized for purposes of Art. 95B, § 9-306 (2). As set forth above, the characterization of the trucks as inventory for sale without any restrictive clause prohibiting or at least requiring prior consent for such sales, implies the permissibility of such sales. The evidence also showed

that the Mercantile contemplated, knew of and acquiesced in such sales. In addition, Mercantile made a claim for proceeds in the financing statement. Under these "circumstances", the "nature of the collateral" and without any "course of dealing" or "usage of the trade" to the contrary, it would seem that the sales were impliedly authorized. There are no cases precisely in point.

*In Re Vaillancourt,* 7 U.C.C. Rep. Serv. 748 (D.C. Maine, 1970) and *First Finance Co. v. Akathiotis,* 110 Ill. App. 2d 377, 249 N.E.2d 663 (1969) differ from the case at bar in that the contemplation of sale or lease of the collateral in those cases was expressly evidenced in the security agreement itself. The basis of the decisions apparently was not limited by this factor as *In Re Vaillancourt, supra,* at p. 779 cites *Akathiotis, supra,* for the general proposition, "that where the secured party acquiesces in a transfer of collateral by the debtor, the transfer will be said to have been 'authorized' within the meaning of the Uniform Commercial Code § 9-306 (2) and the security interest will not continue effective against the transferee and its creditors."

*Vermilion County Production Credit Ass'n v. Izzard,* 111 Ill. App. 2d 190, 249 N.E.2d 352 (1969), which is distinguishable, holds that a claim for proceeds in the financing statement is not in itself enough to imply authorization for sale. In that case the collateral was not described as inventory for sale and there was no evidence of the secured party having contemplated or known of the sale. On the other hand in *Clovis National Bank v. Thomas,* 77 N.M. 554, 425 P. 2d 726 (1967), there was a restrictive clause in the security agreement requiring written consent of the secured party before the debtor could sell the collateral. The debtor sold the collateral without obtaining the above consent. There was no indication that the secured party had actual knowledge of the sale. The Court held that the bank's common practice of allowing such sales without adherence to the restrictive clause constituted a waiver and that the bank had § 9-306 (1) as authority to sell.

The trial court in its memorandum opinion stated:

"It is undisputed that at the time of the purchase the defendant [Mercantile] had a perfected security interest *in inventory* and had filed a financing statement which described the types of collateral and in fact specifically referred to the two *purchased* trucks." (Emphasis supplied.)

Later in the lower court's opinion, however, it stated: "Moreover he [McFadden] was not a buyer out of inventory."

We agree that the security interest was in inventory and the financing statement so describes it. The trial judge's first finding on the facts in this regard was correct but the trial judge fell into error in not giving this finding the effect required by Art. 95B, § 9-306 (2) and apparently changed his mind later in his opinion in regard to the trucks being "inventory."

### (2)

The trial court was of the opinion that the sale of the two trucks by Softee to McFadden was not made to the buyer "in the ordinary course of business" as defined by the UCC, Art. 95B, § 1-201 (9) and hence the provisions of Art. 95B, § 9-307 (1) did not apply. In our opinion, the lower court was clearly in error in this conclusion.

Art. 95B, § 1-201 (9) provides:

"(9) *'Buyer in ordinary course of business'* means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. * * *"

Art. 95B, § 9-307 (1) provides:

"(1) A buyer in ordinary course of business

(subsection (9) of § 1-201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

The Official Comment (Code, Vol. 8B, page 398), subparagraph 2 states:

"2. The definition of 'buyer in ordinary course of business' in Section 1-201(9) restricts the application of subsection (1) to buyers (except pawnbrokers) 'from a person in the business of selling goods of that kind': thus the subsection applies, in the terminology of this Subtitle, *primarily to inventory*. Subsection (1) further excludes from its operation buyers of 'farm products', defined in Section 9-109(3), from a person engaged in farming operations. The buyer in ordinary course of business is defined as one who buys 'in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party.' This section provides that such a buyer takes free of a security interest, even though perfected, and although he knows the security interest exists. Reading the two provisions together, it results that the buyer takes free if he merely knows that there is a security interest which covers the goods but takes subject if he knows, in addition, that the sale is in violation of some term in the security agreement not waived by the words or conduct of the secured party.

"The limitations which this section imposes on the persons who may take free of a security interest apply of course only to unauthorized sales by the debtor. If the secured party has authorized the sale in the security agreement or other-

wise, the buyer takes free without regard to the limitations of this section. Section 9-306 states the right of a secured party to the proceeds of a sale, authorized or unauthorized."
(Emphasis added.)

The trial court was of the opinion that the sale of the trucks was incidental to the franchise agreement; that Softee was not in the business of selling trucks but in the business of providing dealer franchises; that McFadden never saw the trucks, never intended to operate them himself but purchased them for investment only and the trucks were never registered to McFadden, and for these reasons McFadden was not a buyer in the ordinary course of business. Again we disagree with the trial court's conclusion and find it clearly in error.

As we have already observed the financing statement clearly refers to the trucks as inventory held for sale or lease. The officials of Mercantile knew that Softee was engaged in the business of "selling goods of that kind," namely, selling or leasing of ice cream trucks to the public. Comment 2 under § 9-307 indicates that the terminology of the section applies *"primarily to inventory."* The record indicates that Softee was a dealer in goods of that kind. The agreed statement in lieu of Plaintiff's Exhibit No. 1 states that it consists of 13 Conditional Contracts of Sale between Softee and various purchasers for the purchase of nine ice cream trucks described in the contracts of sale, and by analysis of the prices in the contracts of sale, probably 11 additional trucks. Mercantile, itself, supplied forms for Conditional Sale Agreements which indicated that sales of trucks would be made by Softee.

It is true that McFadden did not intend to operate the trucks personally, but the testimony of Mr. Ledsome indicated how and by whom the trucks would be operated for McFadden.

Even if a franchise was purchased with each sale of a truck and required by Softee for such a sale, the trucks

were nevertheless inventory held by Softee for sale to the public; and Softee was still in the business of "selling goods of that kind."

Under these circumstances McFadden took free of the security interest of Mercantile whether or not Mercantile authorized the sale as we have already indicated that it did. See *Franklin Investment Co. v. Homburg*, 252 A. 2d 95 (D.C. App., 1969) ; *Rattan Chevrolet, Inc. v. Associates Discount Corp.*, 443 S.W.2d 360 (Texas Civ. App., 1969) ; and *Howarth v. Universal C.I.T. Credit Corp.*, 203 F. Supp. 279 (W.D. Pa., 1962).

Our conclusions in this case carry out the purpose of § 9-306 (2) and 9-307 (1) which was to protect the buying public in cases in which the secured party finances inventory which is sold to the public by the debtor in the regular course of the debtor's business. The underlying philosophy of the UCC is to protect the security interest so long as it does not interfere with the normal flow of commerce. See Lee, *Perfection of Priorities Under the Uniform Commercial Code*, 17 Wyo. L.J. 1, 34 (1962). See also 8 U.C.L.A. L. Rev. 806, 898, *Project, California Chattel Security and Article Nine of the Uniform Commercial Code* (1961).

Mercantile urges upon us a point not passed upon by the trial court, *i.e.*, that McFadden abandoned or rescinded the agreement with Softee so that his interest in the trucks had terminated prior to the filing of the action in the present case, contending that if the decision of the lower court is correct for a reason properly before this Court, we will affirm the decision below even upon a different reason than that assigned by the lower court as we indicated in *Aubinoe v. Lewis*, 250 Md. 645, 649, 244 A. 2d 879, 881 (1968), and prior decisions of this Court therein cited.

In our opinion, however, the evidence does not indicate that McFadden and Softee reached a mutual agreement to abandon or rescind the agreement between them. The testimony in regard to the telephone conversation be-

tween McFadden and Marshall, President of Softee, has already been given in substance. Marshall did not state that Softee would cancel the contract and return the down payment and $4,000 note. He stated, according to Mc-Fadden, that he would sell the trucks. The selling of the trucks was to be for McFadden, not for Softee after a recision of the contract. McFadden stated in his deposition that he asked Mr. Marshall to sell his [McFadden's] trucks. Marshall, at the most, was offering his services to try to sell the trucks *for McFadden*. This does not establish a mutual agreement to rescind or abandon the contract between Softee and McFadden; rather it appears to assume that the contract continues but with the willingness by Marshall to sell McFadden's trucks for him, and thus to seek to get McFadden's money back in this way.

> *Judgment of May 25, 1970, reversed and case remanded to the Superior Court of Baltimore City with directions to enter judgment in favor of the appellant, Charles D. McFadden on the question of liability for the conversion of the two ice cream trucks by the appellee, Mercantile-Safe Deposit and Trust Company, and for further proceedings to determine the amount of damages resulting from the conversion of the trucks, and the entry of judgment therefor, the costs to be paid by the appellee.*