In the Matter of BENTON TRUCKING SERVICE, INC., Debtor.

PACCAR FINANCIAL CORPORATION, Plaintiff,

v.

BENTON TRUCKING SERVICE, INC., Monroe Bank & Trust Co., and Louis Eicholtz, Defendants.

Bankruptcy No. 81–02722–B.
Adv. No. 80–0928.

United States Bankruptcy Court,
E. D. Michigan, S. D.

July 6, 1982.

---

**5.** House Report No. 95–595, 95th Cong., 1st Sess. 364 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6320.

Ronald L. Rose and Paul Owen Ashba, for Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for plaintiff.

Richard Ford, for Fischer, Franklin, Ford, Simon & Hogg, Detroit, Mich., for Monroe Bank & Trust, defendants.

## OPINION

GEORGE BRODY, Bankruptcy Judge.

This action involves the relative rights of competing secured creditors to the proceeds of sale of two tractors.

Benton Trucking Service, Inc. (debtor) was in the business of hauling freight. On or about August 16, 1979, the debtor purchased two Kenworth tractors from the Whiteford Sales and Service. The price of each tractor was in excess of $60,000. The debtor made a down payment of $10,000 on each tractor and financed the balance of the purchase price pursuant to retail installment contracts. The contracts provided in pertinent part that

> Buyer promises not to give any other party a lien or security interest in the collateral without seller's written consent. Buyer promises not to part with possession of, sell or lease the collateral without seller's written approval.

The seller immediately assigned the contracts to Paccar Financial Corporation (Paccar). Titles to both vehicles were issued to the debtor by the Michigan Secretary of State listing Benton Trucking Service, Inc. as owner, and the secured party as Paccar Financial Corporation.[1]

In January of 1980, debtor sold the tractors to a Louis Eicholtz (Eicholtz) and delivered to him the title certificates properly endorsed and containing notarized termination statements ostensibly executed by Paccar certifying that Paccar no longer claimed an interest in the vehicles. Eicholtz financed this transaction by borrowing approximately $70,000 from the defendant Monroe Bank & Trust Company (Bank), using the tractors as collateral. New certificates of title were issued by the State of Michigan showing Eicholtz as owner and the Bank as lienor. The debtor then leased the vehicles from Eicholtz. The debtor defaulted on the required contract payments to Paccar, and Paccar repossessed the tractors in early 1980 and promptly scheduled a foreclosure sale. Prior to the scheduled sale, the debtor filed a voluntary Chapter 11 proceeding, which was subsequently converted to Chapter 7. Upon being informed of the Bank's claim of interest in the tractors, Paccar instituted an action against the debtor, the Bank and Eicholtz to obtain relief from the automatic stay in order to enable it to sell the tractors it had repossessed and to apply the proceeds against its debt of $129,989. The tractors were sold with the consent of all parties for $72,000, and the proceeds are being held pending the outcome of this litigation.

The trustee concedes that he has no interest in the fund. Eicholtz has disclaimed any interest in the trucks and has been dismissed from this action. The Bank filed an answer contending that it had a security interest in the tractors that was paramount to the interest of Paccar. The Bank's contention that its security interest in the trac-

tors is paramount is based upon the following arguments.

Initially, the Bank contends that, by virtue of the termination statement, Paccar released any lien it may have had with respect to the tractors. However, the testimony establishes that there was in fact no release executed by Paccar. The principal stockholder and chief operating officer of the debtor disappeared after the bankruptcy filing and did not testify at the trial. The Notary who notarized the termination statement was called as a witness, but invoked the Fifth Amendment privilege. The termination statement was purportedly executed by a "Robert J. Horbo—".[2] A William Horbowy was employed as a financing coordinator for Paccar, and testified that he conceivably would have had the authority to release a lien on collateral, but only in the absence of the regional manager or financing representative. However, Mr. Horbowy testified that he did not sign the termination statement nor was it signed by any Paccar representative authorized to release a lien. The testimony conclusively establishes that the termination statement was forged. A forged instrument does not confer or transfer any rights. The forged termination statement did not, therefore, divest Paccar of its admittedly valid security interest in the tractors. *Anderson v. Donato*, 224 Mich. 216, 193 N.W. 805 (1923); *First Nat'l Bank v. Shaw*, 149 Mich. 362, 112 N.W. 904 (1907); *Bradley v. Mann*, 37 Mich. 1 (1877).

Additionally, the Bank claims that Paccar was at fault in that Paccar failed to run an adequate credit check, failed to take prompt action upon default of the debtor and should have retained the certificates of title to the vehicles until the loan was repaid. The failure by Paccar to do so made it possible for the debtor to defraud the Bank and, therefore, the loss should fall on the

---

1. Prior to 1976, perfection of a lien on a vehicle not held as inventory required both notation of the lien on the title and the filing of a financing statement. MCLA § 440.9302(4). In 1976, the requirement of filing a financing statement to perfect a lien in a vehicle not held as inventory was abolished by P.A.1976 No. 27 § 1.

2. The last letters of the signature are not distinguishable.

party whose carelessness made the fraud possible. *Pioneer Finance Co. v. Dart Nat'l Bank*, 365 Mich. 455, 113 N.W.2d 775 (1962); *Daas v. Contract Purchase Corp.*, 318 Mich. 348, 28 N.W.2d 226 (1947); *Winchell v. Moffat Co. St. Bank*, 307 F.2d 280 (10th Cir. 1962).

There has been no showing, however, that Paccar's conduct was careless or culpable, or that a finance company is required to run a credit check of a debtor as a condition of financing a given transaction. A credit check is made by a lending agency solely for its protection. The purpose of a credit check is not to protect third parties. The credit check that Paccar made was sufficient in its opinion to justify financing the debtor's purchase of the tractors. Paccar was required to do no more.

The debtor was in default on the note to Paccar on and off from September, 1979, to the time the tractors were repossessed. The debtor ostensibly refused to make payments on the grounds that the trucks were not mechanically sound. Paccar apparently was satisfied with this explanation. The procedures to be employed to collect a debt in default is a matter of individual business judgment. The fact that Paccar did not take immediate steps to repossess the trailers is not a ground for estoppel.

In support of its contention that Paccar should have retained the certificates of title until the loan was repaid, the Bank relies upon *Muir v. Jefferson Credit Corp.*, 108 N.J.Super. 586, 262 A.2d 33 (1970) and *General Motors Acceptance Corp. v. Hill*, 95 Ariz. 347, 390 P.2d 843 (1964). On facts similar to the facts of this controversy, the courts in *Muir* and *Hill* held that by permitting the purchaser of a vehicle to retain the original certificate of title, the secured creditor "created a risk that the original certificate in the hands of a purchaser might be fraudulently negotiated and that innocent persons might rely thereon to their detriment," and, therefore, the secured creditor was estopped from relying on its security interest. *Muir, supra*, 262 A.2d at p. 39. However, this conclusion was based upon the fact that the Motor Vehicle Acts in *Muir* and *Hill* specifically provided that where a vehicle was sold subject to a lien, the original certificate of ownership was to be retained by the lienholder until the entire amount of the lien was fully paid.[3] In contrast, the Motor Vehicle Act of Michigan has no such requirement. The Michigan Act merely directs the Secretary of State to mail or deliver the certificate of title "to the owner or other person the owner may direct." § 257.222(5). It does not require the secured creditor to retain the original certificate of title. It may be that the Act should be amended to provide that the secured party retain the certificate of title until its loan is repaid, but until the Act is amended, a secured creditor should not be deprived of his interest in collateral when he has done everything that the law requires and there is no evidence to establish that the creditor had knowledge or reasonable cause to believe that the holder of the certificate would engage in criminal conduct. *Metro Plan, Inc. v. Kotcher-Turner, Inc.*, 296 Mich. 400, 296 N.W. 304 (1941). *See, also, Central Finance Co. v. Garber*, 121 Ind.App. 27, 97 N.E.2d 503 (1951); *Webster v. Universal C.I.T. Credit Corp.*, 322 S.W.2d 375 (Tex.Civ.App.1959); *Commercial Credit Co. v. American Mfg. Co.*, 155 S.W.2d 834 (Tex.Civ.App.1941), Annot., 18 A.L.R.2d 813 (1951).

Finally, the Bank contends that the sale by debtor to Eicholtz, even though fraudulent, deprived Paccar of its security interest in the tractors. This contention is based on

---

**3.** The New Jersey Motor Vehicle Act involved in *Muir* provided that in the case of a sale which is "subject to a security interest," the encumbered certificate of ownership "shall be delivered to the holder of the encumbrance or secured party." N.J.S.A. 39:10–11(B).

The Pennsylvania Motor Vehicle Act involved in *Hill* provided that the certificate of title must be delivered to the lienholder and it shall "be retained by such person until the entire amount of such lien or encumbrance is fully paid by the owner of said motor vehicle, trailer, or semi-trailer." Pa.Stat.Ann. tit. 75 § 33(B) (Purdon).

Section 9–307(1) and Section 1–201(9) of the Uniform Commercial Code.

Section 9–307(1) provides that a buyer in the ordinary course of business "takes free of a security interest created by the seller even though the security interest is perfected and even though the buyer knows of its existence." A buyer in the ordinary course of business is "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods of that kind." § 1–201(9).

■ To prevail, the Bank, therefore, must establish that Eicholtz was a buyer in the ordinary course of business, and that the debtor was engaged in the business of selling trucks and trailers. It is conceded that Eicholtz purchased the tractors, if in fact he did purchase them, in good faith and without knowledge that the sale was in violation of any rights that Paccar had in the collateral.[4] To establish that the debtor was engaged in the business of selling trucks and trailers, the Bank introduced in evidence newspaper advertisements placed by the debtor before and after he purchased the Kenworth tractors, offering vehicles for sale, and evidence that the debtor did in fact sell some vans and tractor-trailers. From the time that the debtor began operations in 1978 until the filing of the petition in bankruptcy, the debtor purchased 12 to 15 vehicles, consisting of single-body vans and tractor-trailers. At least four of the vehicles were sold to enable the debtor to purchase replacement equipment to upgrade its operation. An additional three vehicles, including the two Kenworth tractors, were sold in response to financial pressure.[5] Faced with the problem of reducing costs and generating capital, the vice presi-

dent of the debtor testified that a decision was made to dispose of some of its equipment and lease that equipment back from the purchaser when it had need for extra tonnage.[6]

The nature of the collateral, whether equipment or inventory, is to be determined by the use intended at the time the security agreement is executed. *See, e.g., In re Barnes*, 11 U.C.C.Rep.Serv. 670 (D.Me.B.J. 1972); *In re Morton*, 9 U.C.C.Rep.Serv. 1147 (D.Me.B.J.1971); *White and Summers, Uniform Commercial Code* § 23–13 (2d ed. 1980). In the instant case, however, it is immaterial whether the test to be applied is intended or actual use, since the debtor at all times held all vehicles as equipment and not as inventory. Whiteford and Paccar reasonably believed that the debtor was purchasing the tractors as equipment and not as inventory for sale. The contracts of sale specifically support this belief by providing that the "buyer promises not to part with possession of, sell or lease the collateral without seller's written approval." The debtor's principal business purpose was to haul freight and not to sell trucks and trailers. Whatever sales were made were merely incidental to that purpose. "A sale incidental to the principal business does not make the seller a person in the business of selling goods of that kind." *O'Neill v. Barnett Bank*, 24 U.C.C.Rep.Serv. 779, 781, 360 So.2d 150 (Fla.App.1978); *Hempstead Bank v. Andy's Car Rental System, Inc.*, 35 A.D.2d 35, 312 N.Y.S.2d 317 (1970). Equipment is not converted into inventory "even though it is the continuing policy of the enterprise to sell machinery when it becomes obsolete." *See Uniform Commercial Code* § 9–109, Official Comment 3. The periodic sale of obsolete equipment to enable the debtor to purchase newer and more

---

4. It is questionable whether the transfers to Eicholtz were actually sales. See fn. 6.

5. The record discloses that only four vehicles were in the possession of the debtor when he filed his petition in bankruptcy. Since there is testimony regarding the sale of only seven vehicles, all of the vehicles apparently have not been accounted for. The trustee was not called as a witness, nor were the books and records

introduced in evidence to document the actual acquisitions and dispositions.

6. Actually, it is questionable whether the transfers to Eicholtz should be characterized as sales. Eicholtz disclaimed any interest in the tractors. He apparently participated in the transaction only to accommodate the missing principals of the debtor to enable them to defraud Paccar.

efficient equipment, and the sales made as part of a plan to convert the conduct of its business operation were not sales by the debtor in the ordinary course of its business.

The authorities relied upon by the Bank are clearly distinguishable. In *American Nat'l Bank v. MAR–K–Z Motors and Leasing Co., Inc.*, 13 U.C.C.Rep.Serv. 142, 208 N.E.2d 209 (Ill.App.1973), the corporation had a long history of car sales and the articles of incorporation stated that the sales of automobiles was one of the corporate purposes. The corporation depended on sales as well as leasing to generate profits for the business.

In *McFadden v. Mercantile-Safe Deposit & Trust Co.*, 260 Md. 601, 273 A.2d 198 (Md.App.1971), the sellers sold ice cream trucks as part of a franchising plan. Purchasers would then buy ice cream supplies from the seller which they then sold to the public from the trucks. The seller did not use any of the trucks personally. The financing statement filed by the secured creditor identified the trucks as inventory, and the creditor knew that the trucks were for sale to independent operators. In addition, the secured creditor supplied the seller with forms to facilitate the sale of the trucks.

In *Kaw Valley St. Bank v. Stanley*, 514 S.W.2d 42 (Mo.App.1974), *Pioneer Finance v. Dart Nat'l Bank*, 365 Mich. 455, 113 N.W.2d 775 (1962), and *Daas v. Contract Purchase Corp.*, 318 Mich. 348, 28 N.W.2d 226 (1947), the secured creditors had actual or constructive notice of the fact that holders of the collateral were retail dealers in the collateral subject to the security interest.[7]

An appropriate order to be submitted.

---

7. *Pioneer Furnace* and *Daas* were decided prior to the adoption of the Code.