**EQUITABLE BANK, N.A.,**

v.

**FORD MOTOR COMPANY**

v.

**Seth C. HETHERINGTON, et al.**

**Civ. No. S 89–3329.**

United States District Court,
D. Maryland.

Nov. 8, 1990.

On Motion to Alter,
or Amend Nov. 27, 1990.

David F. Albright, C. Thomas Brown, Semmes, Bowen & Semmes, Baltimore, Md., for Equitable Bank, N.A.

Robert L. Ferguson, Jr., Robert D. Harwick, Jr., Karen R. Wilkowsky, Baltimore, Md., for Ford Motor Co.

Glenn M. Cooper, Theodore P. Stein, Paley, Rothman, Goldstein, Rosenberg & Cooper, Bethesda, Md., for Seth and Joann Hetherington.

## MEMORANDUM OPINION

SMALKIN, District Judge.

This commercial dispute, revolving around the relative priorities of two U.C.C. Article 9 secured parties in inventory of a now-bankrupt auto parts concern, is before the Court on the various parties' motions for summary judgment, which have been fully briefed, and on which no oral argument need be heard.

Before moving to the merits of the motions, the Court cannot help but remark on the level of animosity among counsel that has, sad to say, characterized this case, almost since its inception. That animosity has manifested itself in motions to compel, motions for sanctions, motions to strike, motions to disqualify counsel, and at least one motion under Federal Civil Rule 11. There is enough blame for this kind of conduct to go around, and, no doubt, each attorney would, if pressed, seek to justify his or her conduct in light of what the opposition did, which is not a constructive way to approach the situation. It should suffice to say that this is not the way to conduct litigation.

Addressing to the merits of the dispute, the Court first takes up Ford's motion for summary judgment, which turns on the absence of sufficient proof of a subordination agreement to justify the declaratory relief sought by Equitable when it started this lawsuit. The Court quite agrees with Ford's position and finds that its motion should be granted.

Although it is true that a subordination agreement under MD.ANN.CODE COMM. LAW ART. [U.C.C] § 9–316 need not have any particular degree of formality, it is also true that it must at the very least meet the definition of *agreement* set forth in U.C.C. § 1–201(3), which "means the bargain of the parties in fact as found in their language or from implication from other circumstances including course of dealing or usage of trade or course of performance...." Despite Equitable's contention, it is clear in this case that there has been no evidence presented of course of dealing, usage of trade, or course of performance, *as those terms are defined in the U.C.C., §§ 1–205 and 2–208.* At most, evidence has been presented of a course of negotiations, out of which Equitable seeks to fashion a contract. Thus, the Court must look to the evidence proffered by the party moved against on this issue, *viz.*, Equitable, to determine whether sufficient evidence has been brought forth to warrant a reasonable fact finder in finding for that party, as if the case were before the Court on directed verdict. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 244, 106 S.Ct. 2505, 2508, 91 L.Ed.2d 202 (1986).

Although Equitable has brought forward evidence that various parties to the closing of the deal thought they had an express subordination agreement with Ford, it takes more than wishful thinking to make an agreement. What there must be is a bargain, that is, some conduct on the part of the party sought to be charged from which a reasonable trier of fact could conclude that it in fact agreed to subordinate. Equitable can point to no such conduct from Ford's employees. One of the only two reasonable views of the evidence on this point is that the attorneys closing the deal well knew or should have known that Ford had not signed or otherwise agreed to a subordination agreement, even though it had been supplied with a draft of one, before the closing. Even so, they took a gamble on closing the deal anyway, in the hopes that a signed subordination agreement would be forthcoming. The other, but less likely view is (as Ford suggests) that there existed a shared misapprehension on the part of the parties that one of the other party's attorneys would take care of nailing Ford down on the subordination agreement before the closing. It is argued that Ford employees' conduct led counsel to believe that Ford would subordinate, but it is so evident from the course of the lengthy negotiations between the various counsel and Ford that all parties were aiming toward a formal, written subordination agreement that it would offend reason to conclude that Ford's failure specifically to advise counsel that it would *not* subordinate should be taken as its agreement *to* subordinate.

Neither the fact that Mr. Matteo, then counsel for the Hetheringtons, later took the position in writing to Ford that there was a subordination agreement nor the fact that the parties' key communicator, during the closing, between the parties to the closing and Ford (Mr. Taubman) thought a signed agreement would be forthcoming is enough to substitute for Ford's unwillingness to agree. In fact, the closest Mr. Taubman came in discovery (in the face of complete and consistent denials from Ford employees that they had ever agreed to subordinate) is this colloquy (Depo. pp. 48–49):

> Q. ... did Mr. Dickson [of Ford] tell you at the conclusion of your conversation or sometime before ... that he understood the transaction?
>
> A. I felt he did ... when I got off the telephone with him, I felt comfortable that one, he understood the transaction; two, felt comfortable in giving the subordination agreement.

Feeling comfortable about another party's level of comfort in agreeing to something

does not, in the absence of any *fact* from which a reasonable fact-finder could find assent, make a contract, and the matter is as simple as that. No citation of authority is necessary to conclude that the "feelings" of the various Maryland parties that Ford had agreed to subordinate, essentially derivative from Taubman and company's contacts with Ford, are not sufficient evidence of Ford's assent to carry this case to a jury on a theory of express or implied contract. The parties proceeded to closing at their own risk without a final, firm oral or written subordination agreement from Ford, and there is not enough evidence to warrant any reasonable fact-finder in concluding otherwise.

▆▆▆ The Court has considered the theories of unjust enrichment and estoppel raised in Equitable's brief, but it finds them utterly lacking in merit. Absent evidence that anyone acting for Ford ever spoke words or engaged in conduct upon which a reasonable person could rely in concluding that an agreement had been reached, there is no estoppel, and the application of an unjust enrichment theory to the facts of this case is, to say the least, baffling. If anything, enforcement of this chimerical "agreement" would unjustly enrich Equitable at the expense of Ford, which was justifiably entitled to rely upon its U.C.C. priority and not give it up for the dubious benefits of subordination without a satisfactory, signed agreement.

For the stated reasons, Ford's Motion for Summary Judgment as to the complaint of Equitable will be *granted,* by separate order. This will effectively moot the counterclaim by Ford against Equitable, as that counterclaim does no more than to state the opposite of Equitable's claim-in-chief, and the grant of summary judgment on the claim-in-chief establishes the parties' relative priorities, when taken in conjunction with the discussion next following as to Equitable's Motion for Summary Judgment. Accordingly, the order to be entered herein will also provide that the counterclaim of Ford be dismissed, as moot.

▆▆ The Court next turns to Equitable's Motion for Summary Judgment. The Court finds that the same should be *denied,* for the simple reason that Equitable is clearly junior to Ford's U.C.C. Article 9 security interest in the inventory at issue. There can be no genuine dispute that Ford had a continuously perfected, senior (to Equitable) Article 9 interest in the Motorcraft inventory that was taken from Key's warehouse location in Rockville, Maryland, and that such security interest extended to proceeds. The Ford opposition to this motion demonstrates convincingly that the only Motorcraft inventory that could have been in the warehouse was not sold to ARO and/or Roberts, but was sold to Key subject to the senior security interest of Ford. Mr. Hetherington's affidavit of November 1, 1990 at ¶¶ 2 and 3, offered by Equitable in rebuttal, does not show any material factual dispute, because it does not dispute the fact that the inventory in question was subject to Ford's senior interest. The fact that, before it was marshalled in the Key warehouse pursuant to the bankruptcy Court's order regarding cash collateral, it might have been held under the names of ARO and Roberts Brothers is insufficient to overcome the more pertinent assertions of Ford that such inventory had never been sold by Ford to ARO or Roberts. The question is not who had possession of the inventory or nominal title to it, but whether it was free of the Ford security interest, which it obviously was not, in that neither ARO nor Roberts (neither of them a buyer of this inventory in the ordinary course) could take the inventory free of Ford's security interest. *See* U.C.C. §§ 9–306 and 9–307. Under indisputable U.C.C. principles, Ford had acquired as long ago as 1978 a valid, perfected security interest in the inventory sold thereafter to Key, and its proceeds (which would be continuously perfected as to inventory proceeds of the inventory collateral *ad infinitum,* U.C.C. § 9–306(3)(a)), which was effective under both Maryland and District of Columbia law when originally perfected and at all times relevant to the present case, and which is entitled to Article 9 priority. U.C.C. §§ 9–103, 9–401, and 9–312. Therefore, Equitable can advance no facts supporting its entitlement to summary judg-

ment on Article 9 priority, and its legal position is otherwise so obtuse as to escape understanding. Finally, the Court sees no need to address the receivables issue which seems to have popped up for the first time in Equitable's reply memorandum; it suffices to note that it is far outside the issues framed by the pleadings in this case and just has nothing to do with it. Accordingly, Equitable's motion for summary judgment will be *denied.*

■ Turning to the Third–Party Defendants' Motion for Summary Judgment, the order to be entered herein will grant the same, but not on the grounds sought in the motion. Rather, the ground will be that the third-party claim by Ford against the Hetheringtons is *moot,* in light of the grant of summary judgment in favor of Ford on the principal claim. The Hetheringtons' Motion for Rule 11 Sanctions, accompanying their Motion for Summary Judgment, is *denied,* in that the Court finds that reasonable grounds for the third-party complaint, other than an obviously invalid oral guarantee, existed. Specifically, though discovery has proved it probably lacking in merit, a weak good faith argument could be made to justify the third-party claim, on the basis of the Hetheringtons' September 30, 1988 written Surety Agreement. Therefore, Rule 11 sanctions are not in order.

■ There remains for disposition only the counterclaim of the Hetheringtons against Ford. Because it appears from the deposition testimony (at pp. 85–92) of the Hetheringtons' then attorney, Mr. Matteo, that no facts could be advanced in good faith to show that Ford ever had a contract with or for the benefit of the Hetheringtons to subordinate its secured position to that of Equitable, or that it was negligent towards them or engaged in false representations to them, Ford is entitled to summary judgment on the third-party defendants' counterclaim, as the order to be entered herein will also so state.

■ Finally, as mentioned above, the Court has been bothered by the nasty tone of this litigation, and it finds that the most appropriate way to address this is to exer-

cise its discretion with regard to costs so that each party bears its own costs. The parties, who certainly bear at least part of the responsibility for this rancor, can then sort out with their own counsel the ultimate responsibilities for financing this litigation.

## ON MOTION TO ALTER OR AMEND

This matter is before the Court on the plaintiff's motion to alter or amend, or, in the alternative, to reconsider the Court's Judgment of November 8, 1990. Although the motion is not so plainly unreasonable to be sanctionable under FED.R.CIV.P. 11, it is plainly devoid of merit, and it will be summarily denied, for reasons that follow.

■ The first point of the motion, and the one upon which most ink was spilt, is plaintiff's contention that Motorcraft inventory sold by Key to ARO was taken by ARO as a buyer in the ordinary course, free of Ford's security interest. *See* Md. Comm.Law Code Ann. (U.C.C.) §§ 1–201(9), 9–306(2), and 9–307(1). *See also McFadden v. Mercantile Safe Deposit and Trust Company,* 260 Md. 601, 273 A.2d 198 (1971). The problem with this argument is that, by the terms of its own surety agreement with Ford, entered into by ARO in 1972, whereby ARO undertook to act as surety for Key's obligations to Ford arising thereafter from Key's purchase of goods from Ford, ARO itself became an Article 9 debtor with respect to such goods, under the definition of *debtor* in U.C.C. § 9–105(1)(d). *See National Bank of Washington v. Pearson,* 863 F.2d 322, 326 (4th Cir.1988). *See also United States v. Dehaven,* 703 F.Supp. 414 (D.Md.1989). Thus, the net Article 9 effect of the sales by Key to ARO was nil, just as if Key had sold the goods to itself, because the sale was from one debtor with respect to the goods to another debtor in the same shoes as the seller, who is obviously not a buyer in the ordinary course, and the sale must be entirely disregarded for Article 9 purposes. Thus, Article 9 priority is reckoned as if no sale had taken place, and the goods remained subject to Ford's properly perfected

purchase-money security interest in the hands of ARO, just as they had been when still in Key's hands. Under these circumstances, there also obviously can be no *McFadden*-type argument that Ford impliedly consented to a transaction whereby Key inventory would pass to ARO free of the purchase-money priority Ford had in it when it was in the hands of Key.

Turning to the next point, the Court sees no reason to allow Equitable, at this late stage of the proceedings, to amend with regard to the Roberts Brothers inventory. No reason is presented justifying counsel's earlier failure to present this issue in a justiciable form when the case was properly before the Court on motions filed after it had been pending for some time.

Equitable next turns to the question of Ford's attempts to realize on ARO's accounts receivable arising from ARO's sales of Motorcraft inventory acquired by it from Key. Because this argument depends on the notion that such inventory passed to ARO as a buyer in the ordinary course free of Ford's security interest in the Key inventory, a notion that has been fully dealt with above, this argument presents no ground for relief. Ford was entitled to pursue the accounts as proceeds of the inventory of ARO, with ARO standing as a debtor in the same shoes as Key, for the reasons stated above.

Finally, Equitable seizes upon statements made by Mr. Taubman in his resumed deposition of November 6, 1990, as showing that there is a genuine dispute of fact concerning the alleged oral subordination agreement, the issue that most concerned the Court and the parties when this case was presented on motions. The statements at pages 13 and 14 and 17 and 18 of that deposition, and referred to on pages 24 and 25 of Equitable's memorandum in support of the present motion, are clearly hearsay and insufficient to generate any triable issue. Furthermore, the extract from page 36 of the said deposition, set forth on page 25 of the memorandum, is no more than what Mr. Taubman said to Freeman and Hetherington, as a statement of his belief as to what Ford was going to do,

and it in no way is sufficient to generate a triable issue as to whether Ford in fact had agreed to subordinate. No Ford employee is named therein, it quotes no specific language of agreement by Ford, and, most importantly, Mr. Taubman's answer was to a question about what he said to Freeman and Hetherington, not what Ford employees said to him. Both standing alone and in context with Taubman's earlier deposition testimony, what is served up in this regard by plaintiff in the form of the Taubman testimony is still chicken feathers, not chicken salad, on the subordination agreement issue, in the context of Rule 56 as recently construed by the Supreme Court.

For the reasons stated, an order will be entered separately, denying Equitable's motion to alter or amend or to reconsider.